Anthony LIUZZO, Jr., Thomas Liuzzo, Penny Liuzzo Dupure, Mary Liuzzo and Sally Liuzzo, Individually and as representatives of the Estate of Viola Liuzzo, deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 79–60014.

United States District Court, E.D. Michigan, S.D.

May 27, 1983.

---

Grant J. Gruel, Grand Rapids, Mich., Francis Hare, Jr., R. Gordon Pate, Birmingham, Ala., Margie Tyler Searcy, Tuscaloosa, Ala., J. Jeffrey Long, Ann Arbor, Mich., Robert J. Riley, Anthony A. Derezinski, Grand Rapids, Mich., Joseph W. Cotchett, San Mateo, Cal., Dean A. Robb, Traverse City, Mich., for plaintiffs.

Ann Robertson, Alan Mishael, U.S. Dept. of Justice, Washington, D.C., L. Michael Wickes, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This action concerns the death of a woman from Detroit as she was assisting in the transportation of civil rights marchers on the Selma to Montgomery Voting Rights March in 1965. Mrs. Liuzzo was shot and killed on the evening of March 25, 1965, as she was driving one of the marchers back to Montgomery from Selma. The shots were fired from a car containing four members of the Ku Klux Klan. One of the persons in that car was Gary Thomas Rowe, an informant on Klan activities for the F.B.I. As a result of Rowe's immediate report of the shooting to the agent directing his activities, the others in the car were arrested within 15 hours of the shooting and were ultimately convicted of violating Mrs. Liuzzo's civil rights.

This action was filed under the Federal Tort Claims statute asking damages for her death. 28 U.S.C. §§ 1346,

2401(b), and 2671 *et seq.* The court has already held that the filing of this action was timely for the reasons stated at 485 F.Supp. 1274 (1980). The court has already ruled that the action is not barred by the assault and battery exception to the Tort Claims Act. 28 U.S.C. §§ 1346(b), 2680(h); 508 F.Supp. 923 at 927 (1981). The actions of the F.B.I. agents in directing informants was also held not to be a discretionary function as that is defined in the Tort Claims Act. 28 U.S.C. § 2680(a); 508 F.Supp. 923 at 930 (1981). It should be made clear, however, that the decision of the Director of the F.B.I. to use informants in general, and his decision to use informants to infiltrate the Ku Klux Klan to provide information on Klan activities and to assist the F.B.I. to carry out its mission, falls squarely within the discretionary function exception. In the same way the Director's decision as to how such informers should be controlled, directed, used and rewarded cannot become the basis for a tort claim, as those decisions likewise involve a discretionary function. 28 U.S.C. § 2680(a).

In this case the court held that a narrower issue remained, an issue that was not within the discretionary function exception. That issue involves the actions of the F.B.I. agents in directing the informant, i.e., whether these actions, in light of the instructions given agents by superiors, were those of a reasonably prudent and careful agent or were those of an agent who was negligent.

The court listened to the testimony for eight days about a particularly sordid and sad period in our history. It is not necessary to detail all of the evidence but it is clear that in the early 1960's a group of sorry individuals calling themselves the "Ku Klux Klan" were engaged in a conspiracy to obstruct the efforts of others, both black and white, to promote equal treatment of black citizens before the law in the State of Alabama. Particularly in and around Birmingham, this group was engaged in bombings, beatings, threats and killings of those persons, mostly black, who spoke out for and helped bring civil rights to the black person. In this area at this time, the Ku Klux Klan was a despicable group of people who would stop at nothing to frighten blacks and their supporters and to prevent the blacks from voting and using any of the other common rights that the rest of us have taken for granted for so long.

The F.B.I. during this time was actively engaged in attempting to gather information on this subversive group. Special efforts were made by the F.B.I. to obtain informants who would report regularly on the activity of members of the Ku Klux Klan so that, with this information, local law enforcement officials could prevent violence.

■ There were a number of problems:

(a) Many local law enforcement officials were almost as bad as the Klan itself. F.B.I. information given to them failed to prevent the attacks.

(b) The F.B.I. at that time considered its mission to be that of an information gathering agency, "Federal Bureau of Investigation", and did not act as a federal police force except in cases where a specific federal statute was violated. Whether this was a correct or an incorrect view of their authority is not a relevant concern, because clearly such a decision would be part of the discretionary function exception of the Tort Claims Act. Nevertheless, it was not until the event in this case that the F.B.I. leadership began to act as more than an information gathering agency in the field of civil rights.

(c) Good people were not likely to get very far attempting to infiltrate a bad group such as the Ku Klux Klan. In other words, if there was to be information from inside the Klan, it had to come from someone who would look like a Klansman, talk like a Klansman and act like a Klansman. Therefore, sometimes it was actually a Klansman who, for whatever reason, provided information to agents of the F.B.I.

Early in the 1960's Rowe was recruited by an agent of the F.B.I. to be an informer in the Birmingham area. Rowe fit the description of a possible Klan informant. He

644

looked like a Klansman. He could talk like a Klansman and he appeared to be comfortable acting with Klansmen. He had the appearance of an unschooled, rough, tough red neck. He joined the Klan, became an active member. He immediately began to report information. He would do this by phone and by letter. All contacts were made in a code name. The actual identity of the informant was known only to the directing agent and contacts were made only with him. Rowe was encouraged by his directing agent to work his way up in the Klan because it was discovered that the conspiratorial acts against blacks were planned and executed by smaller groups of the Klan elite called action squads. He became a member of one of these action squads and participated in and reported on the activities, future and past, of that group. At one time information furnished by Rowe about an intended assault probably saved the life of one of the most distinguished early leaders of the black civil rights movement. The F.B.I. was able to warn that person and the threat was not successful.

Rowe was finally appointed a leader of the action squad in the Eastview 13 Klavern to which he belonged. When he reported this, F.B.I. headquarters in Washington directed that leadership of violent activities, even for the purpose of giving information, would not be tolerated and that he must resign his leadership position. He did. He was told further that when he got into a position where illegal acts were expected of him, he should not join in but fake participation and in various ways attempt to avoid such acts.

The evidence is much in dispute as to whether or not he always carried out this direction and the court believes that the evidence establishes that there were times when Rowe committed violent acts along with other Klansmen and was not fully truthful in reporting on his own activities. It seems to the court that the various directing agents could not have helped but know that Rowe sometimes engaged in acts of violence. He would not have been permitted to be present time after time at

events involving violence if he had not participated in some way. The agents as reasonable people must have realized this.

He was a good informer, perhaps the best informer in the whole area, and he was trusted by the Klan leadership. His information helped the F.B.I. keep track of at least one segment of the Klan. How well they used the information provided is not for this court to decide.

Rowe was active as an informer over a period of five years. Finally he was asked by the Klan leadership to go to Montgomery to observe the Selma-Montgomery Civil Rights March. He went with Eugene Thomas, Collie Leroy Wilkins and Orville Eaton. Before he went he reported to his directing agent, told him of plans for the trip, and was encouraged to go. The F.B.I. wanted as much information as possible about the Klan's reaction to the march.

The entire trip occupied about twelve hours. The story involves the four of them at first simply watching, then heckling, then talking among themselves about violence, then chasing the car, and then shooting. It is a story of mindless egos feeding each other, gradually working themselves up until violence erupted. Rowe's part in what occurred is not easy to determine.

Rowe describes in detail what occurred. Nothing he says suggests that he shot Mrs. Liuzzo or that he in any way encouraged the shooting. In fact, statements, made both contemporaneously and a short time thereafter, suggest that what he said and did was an attempt to defuse the tension and suggest alternatives to the shooting. Rowe says that Wilkins and Eaton shot at the car and that Thomas encouraged them to shoot.

On the other hand, Wilkins and Thomas both say that Rowe was the shooter. Wilkins and Thomas say that Wilkins was not sitting on the side of the car from which the shots came and that Rowe was the aggressor. Wilkins is not a believable witness; from observing him at his deposition and hearing what he said, the court finds him and his story not credible. Thomas' testi-

mony was sharply impeached by his former wife. She testified that a few weeks after the shooting Thomas told her that Wilkins shot Mrs. Liuzzo at his direction. This agrees with Rowe's description of the shooting. This impeaching testimony was particularly compelling because she came forward only after she had seen a report on television featuring Thomas and the testimony he had given in this case. She said that Thomas had lied and that she came forward and offered her testimony in response to the lie. In view of this, Thomas' testimony simply falls apart.

This lawsuit claims damages for the death of Viola Liuzzo. It is an action for a discrete tort. It is not a suit claiming damages for any other act of violence in which Rowe may have been involved. Evidence of Klan activities and Rowe's involvement in other violent acts of the Klan were received to show the tenor of the time, Rowe's ability to follow instructions and his character relative to participation in acts of violence.

In order for the plaintiffs to recover in this case they must prove by a preponderance of the evidence:

(1) that Rowe was an informant acting under the direction of an agent of the F.B.I. for the purpose of assisting that agency in carrying out its duties;

(2) that the agents of the F.B.I. directing Rowe did not act as ordinary reasonably prudent agents in carrying out the duties to which they had been assigned;

(3) that Rowe was in the car from which the shots came that killed Mrs. Liuzzo as a part of carrying out his obligations to his directing agent as an informer; and,

(4) that he shot Mrs. Liuzzo or that his presence was a proximate cause of someone else shooting Mrs. Liuzzo.

It is clear that Rowe's trip to Montgomery and Selma with Thomas, Wilkins and Eaton was for the purpose of assisting the F.B.I. to carry out its function of obtaining information about Klan activities. Rowe at the time was acting as an informant under the direction of Agent Shanahan. Before departing for Montgomery, Rowe sought and obtained permission from Shanahan, his directing agent, to make the trip.

It is also clear that Rowe was in the car from which the shots came that killed Mrs. Liuzzo and that he was present in that car as a part of his obligation as an informer to his directing agent.

The court believes that Rowe did not shoot Mrs. Liuzzo. The evidence indicates that Collie Leroy Wilkins shot her and that he was encouraged to do so by Eugene Thomas. The court believes that Rowe did not encourage Collie Leroy Wilkins to shoot. In fact, his statements to the government counsel sometime after the event suggest that he was attempting to defuse the situation without blowing his cover. He succeeded in keeping his cover but not in diverting the action.

The court believes that Rowe's presence in the car was the principle reason why the crime was solved so quickly.

Thus the only remaining issue is whether the agents of the defendant were negligent in directing that Rowe accompany the other Klansmen on this trip.

> The Duty of Those in Charge of Person Having Dangerous Propensities
> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm. [Restatement (Second) of Torts § 319 (1965)]

The comment to this section describes its application to the situation

> in which the actor has charge of a third person who ... has a peculiar tendency [to act injuriously] of which the actor from personal experience or otherwise knows or should know.

The theory of liability embodied in § 319 is one which is well established in tort law, and has been held to create a duty on the part of employers to control employees, institutions to control inmates, hospitals to control patients, and parents to control children. See generally, Pros-

ser, at 349–50. The essence of a cause of action under § 319 is the relationship between the defendant and the tortfeasor. Where the defendant has the ability to control a person who is known or should be known to engage in injurious conduct, the law appropriately requires the defendant to use reasonable care to control that person in order to prevent harm. An analogous basis for recovery has been recognized under the law of Alabama in *Swanner v. United States,* 275 F.Supp. 1007 (M.D.Ala.1967), rev. on other grounds, 406 F.2d 716 (5th Cir.1969), on remand, 309 F.Supp. 1183 (1970). There it was held that the special relationship between the victim, a government informant, and the government gave rise to the government's duty to protect him.

> Whenever there is reasonable cause to believe that a government agent or employee, or any member of his family, is endangered as a result of his performance of his duty to the government, a duty on the part of the government to protect him and the members of his family arises 275 F.Supp. at 1011.

The concept that a special relationship— whether between the defendant and the victim or between the defendant and the tortfeasor—gives rise to a duty on the part of the defendant is well established in tort law.

*Liuzzo v. United States,* 508 F.Supp. 923, 934–35 (E.D.Mich.1981).

The court believes that the methods of operation with informers at the time approved by the F.B.I. involved the type of control or "take charge" suggested in § 319. Rowe became involved in Klan activities at the direction of his agent. He made reports on what he discovered and the government benefited as a result of his activities.

■ Did the directing agent exercise reasonable care in allowing Rowe to go on the trip? The standard of care in this respect must relate to the standards established for the use of informers by superiors in the F.B.I. As indicated before, decisions relative to those standards made by the superiors in the F.B.I. are a discretionary function. So the adequacy of those standards cannot be a basis for liability. But whether the particular directing agent carried out those standards as an ordinary reasonably prudent agent is the question before the court.

■ Two superiors in the F.B.I. testified. Both were at the level of inspectors. Both were involved in policing the activities of agents to see if their actions conform to bureau standards. Both of the F.B.I. inspectors who testified told how important information was to the F.B.I. and how important informants were in assisting the civil rights movement. Bombings were an almost daily occurrence. At the time the Klan was using violence to frighten and intimidate participants in the civil rights movement and keeping informants in the Klan to provide information on its activities was a high priority. It was the opinion of the inspectors who testified that the agent not only acted reasonably in allowing Rowe to go on the Montgomery-Selma trip but also, by inference, that had he not done so, it would have been a disservice to the mission of the F.B.I. and the civil rights movement. The obligation on the part of the directing agent is to act reasonably. In light of all the considerations, the court is satisfied that he did.

■ The question remains whether the government can be liable simply because it placed an informant in the car in which a conspiracy developed causing the death of Mrs. Liuzzo, when the informant acted unsuccessfully to divert the others but did not stop the others' illegal acts by uncovering himself. Nothing the government did indicates that it or its agents were a part of the conspiracy to shoot Mrs. Liuzzo. Rowe was dispatched to obtain information. The fact that, in the process of getting information and protecting his cover, he did not act to prevent an assault certainly cannot impose liability on the government. The law is clear that there is no liability on the part of Rowe for such inaction. *Liuzzo v. United States,* 508 F.Supp. 923, 934–35, (E.D.Mich.

1981); *Peck v. United States,* 470 F.Supp. 1003 (S.D.N.Y.1979); Restatement (Second) of Torts § 314. The basis for liability on the part of the government is even more tenuous.

It is argued that Rowe suggested other assaults, short of murder, on Mrs. Liuzzo and the Liuzzo car. The court believes the most responsible interpretation of these statements is that Rowe was attempting to divert the action and defuse the tension. Taking action to protect his cover and trying to divert the action and defuse the tension by suggesting lesser wrongs, does not make him a conspirator to kill Mrs. Liuzzo.

On the other hand, if he killed Mrs. Liuzzo or if his actions were material factors in causing others to shoot and kill her, a different result would be suggested. Because the agents knew of the possibility of violent acts on the part of Rowe, and of the explosive nature of the dynamics involving the civil rights march, there is serious question as to the reasonableness of putting Rowe in a place and with people where his action might be a cause of this harm. It is not always reasonable to direct persons into situations where they are likely to cause harm either directly or through a conspiracy with others.

But such was not the case here. Rowe did not kill, nor did he do or say things causing others to kill. A fair reading of the credible evidence suggests that his efforts were to divert and defuse and later to report and testify. He was there to provide information and his failure to take steps to stop the planned violence by uncovering himself and aborting his mission cannot place liability on the government.

It is suggested that the government should be held liable because the tort causing Mrs. Liuzzo's death was a tort of concerted action. Prosser, Torts § 46 (4th Ed.1971).

■ The argument falls short, however. It is a theory to impose liability on a participant. It is not a theory to impose liability vicariously or otherwise on persons who were not participants. For concerted action it is necessary to show an express agreement among participants or the active participation in consciously parallel action, or the lending of aid and encouragement to the wrongdoing, or the ratification or adoption of the tortious act.

■ This lawsuit is against the United States Government. It is not against Rowe. There is nothing in the credible evidence to suggest that the F.B.I. agents were in a joint venture with Wilkins, Thomas or Eaton. Nor were they in a conspiracy with the Klan in any way. All of the evidence shows that the F.B.I. was trying to infiltrate the Klan to frustrate its goals. There is no credible evidence in the record from which reasonable persons could conclude that the agents and the Klan members were engaged in concerted action.

As already indicated in other contexts, the evidence does not indicate an agreement between Rowe and the others to harm Mrs. Liuzzo. It does, however, suggest an agreement between Wilkins, Thomas and Eaton to do so. A reasonable interpretation of the evidence does not indicate that Rowe engaged in consciously parallel action or lent aid and encouragement to the wrongdoer. As pointed out earlier, his efforts were to defuse the situation, without indicating to those who would murder, that he was an informant. Clearly he did not adopt or ratify the tortious act. He did just the contrary by reporting it to the authorities.

■ Under the law of liability for concerted action, the evidence fails to show that Rowe was in concert with those who did the killing and there is nothing to indicate that the F.B.I. directing agent had anything in mind but the acquisition of valuable information about a subversive organization.

For all these reasons, the plaintiffs have failed to prove by a preponderance of the evidence that the United States is liable under the rules of tort law recognized by the State of Alabama for private individuals.

Judgment should be entered in favor of the defendants and against the plaintiffs, dismissing the plaintiffs' claims on the merits, and for costs.