492 A.2d 1297

**Alan C. LAMB et al.**

**v.**

**Arnold J. HOPKINS et al.**

**No. 123, Sept. Term, 1983.**

Court of Appeals of Maryland.

June 5, 1985.

Burt M. Kahn, Hyattsville, (Leo Howard Lubow, Walter E. Laake, Jr. and Joseph, Greenwald & Laake, Hyattsville, on brief), for appellant.

Diana G. Motz and Alan D. Eason, Asst. Attys. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Emory A. Plitt Jr. and Martha H. Somerville, Asst. and Sp. Asst. Attys. Gen., respectively, Baltimore, on brief, for appellees.

Argued before SMITH, ELDRIDGE, COLE, DAVIDSON *, RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

COLE, Judge.

We granted certiorari in this case to determine whether a probation officer who fails to report a probationer's violation to the sentencing court owes any duty to an individual injured by the negligence of the probationer.

Because this case reaches us on demurrer,[1] we are required to accept as true all well-pleaded material facts in the declaration and any reasonable inferences that may be drawn therefrom. *Tadjer v. Montgomery County*, 300 Md.

---

* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but died prior to the adoption of the opinion by the Court.

1. By order dated April 6, 1984, we approved and adopted effective July 1, 1984, a revision of the Maryland Rules. This revision resulted in the abolishment of demurrers. *See* Md.Rule 2–302. Maryland Rule 2–322(b)(2), which replaced former Md.Rules 345 and 371 b, provides that a defense based upon the failure to state a claim upon which relief can be granted may be made by motion to dismiss filed before the answer, if an answer is required.

539, 542, 479 A.2d 1321, 1322 (1984); *Cox v. Prince George's County*, 296 Md. 162, 169, 460 A.2d 1038, 1042 (1983). On August 8, 1975, Russell J. Newcomer, Jr., was convicted in the Circuit Court for Frederick County of armed robbery and received a five year sentence, four and one-half years of which the court suspended. After Newcomer served six months of this sentence, the court placed him on supervised probation for the remainder of his term (until August 7, 1980). The probation order required Newcomer to obey all laws, not to possess any firearms, and to participate in an alcohol treatment program.

On April 14, 1978, the Circuit Court for Frederick County held a hearing to determine whether to revoke Newcomer's probation on the grounds that he had been convicted in June 1976 for driving while intoxicated and in September 1977 for driving while impaired. He also had been arrested in October 1977 for driving while intoxicated and had failed to participate in the alcohol treatment program prior to December 1977. The circuit court continued the probation, but specifically cautioned Newcomer that if he became "involved in another alcohol offense," he likely would serve time.

One month after the probation revocation hearing, Newcomer pleaded guilty in the District Court sitting in Frederick County to driving while intoxicated and to driving while his license was suspended. Newcomer received a two year suspended sentence and was placed on supervised probation for one year. In response, the State's Division of Parole and Probation (Division) opened Newcomer's file on a "nonactive" supervision basis. Furthermore, the field agents (i.e., probation officers) assigned to supervise Newcomer[2] failed to report these two District Court convictions to the Circuit Court for Frederick County.

---

**2.** Appellee Thomas Crawford supervised Newcomer and, from January 9, 1979 to September 18, 1979, appellee Dean Williams was also assigned by the Division to supervise Newcomer.

Thereafter, in September 1979, Newcomer was convicted by the District Court sitting in Frederick County of discharging a firearm and of driving while his license was suspended. These probation violations were similarly not reported to the Circuit Court for Frederick County, nor were they reported to the sentencing judge of the District Court who placed Newcomer on a suspended sentence with supervised probation for one year.

On November 10, 1979, Newcomer, again driving while under the influence of alcohol, collided with a vehicle operated by Cynthia Lou Lamb. This collision rendered the Lambs' then five-month-old daughter, Laura, a quadriplegic.

In January 1982, Alan C. Lamb and Cynthia Lou Lamb, as parents and natural guardians of Laura, filed suit against Newcomer in the Circuit Court for Frederick County. In an amended declaration filed in late 1982 plaintiffs also sued the director and various employees of the Division, alleging that at the time of the collision Newcomer was on supervised probation under a suspended sentence, and that these defendants proximately caused the minor plaintiff's injuries by failing to petition the sentencing court to incarcerate Newcomer for numerous probation violations. The Division defendants filed a demurrer, alleging that as public officials they were immune from liability, and further that under the amended declaration they neither owed a duty to plaintiffs nor proximately caused the collision.

Initially, the trial court overruled the defendants' demurrer because the facts were insufficient to determine whether the defendants were immune to suit.[3] Defendants then filed a motion for reconsideration urging the trial court to consider the other grounds for the demurrer. After additional oral argument, the trial court sustained the demurrer without leave to amend by order dated May 10, 1983, on the

---

3. Two months earlier, on January 11, 1983, the plaintiffs settled and satisfied the case as to Newcomer, and filed a joint tortfeasor release. As a result, only the Lambs and the Division defendants remained party to the suit after that date.

ground that the defendants owed no duty to the plaintiffs. Because this order constituted a final judgment under former Md.Rule 345 e, the Lambs filed an appeal with the Court of Special Appeals, but we granted certiorari prior to decision by that Court. We affirm.

I

Three basic elements are necessary to state a cause of action in negligence. First, the defendant must be under a duty to protect the plaintiff from injury. Second, the defendant must fail to discharge that duty. Third, the plaintiff must suffer actual loss or injury proximately resulting from that failure. *See, e.g., Scott v. Watson,* 278 Md. 160, 165, 359 A.2d 548, 552 (1976); *Peroti v. Williams,* 258 Md. 663, 669, 267 A.2d 114, 118 (1970). The focus in this case shall be on the first element, duty, which in general terms requires an actor to conform to a certain standard of conduct for the protection of others against unreasonable risks. *See Prosser and Keeton on the Law of Torts* § 30, at 164 (W. Keeton 5th ed. 1984) [hereinafter cited as *Prosser and Keeton* ].

Appellants basically contend that an individual who controls a person known by him to be dangerous owes a duty to exercise due care to those who may be foreseeably harmed by the failure to exercise this level of care, regardless of whether the foreseeably harmed person is readily identifiable. More specifically, the Lambs argue that the probation officers owed them a duty to exercise due care in controlling Newcomer, known by the probation officers to be dangerous. As a result, the Lambs maintain that the trial court erred in sustaining the demurrer to their amended declaration. The appellees, however, counter that they owed no duty of care to the Lambs because the appellees had neither the right nor the ability to control Newcomer's conduct. Absent a special relationship not present here, appellees contend that no basis exists for imposing liability on them for Newcomer's tortious acts.

In support of their respective positions each party relies upon §§ 315 and 319 of the *Restatement (Second) of Torts* (1965) [hereinafter cited as Restatement]. Because we have never examined these provisions in detail in the past, *cf. Scott v. Watson, supra* (citing § 315), we find it necessary to do so now.

## A.

Section 315 is a special application of the general rule set forth in § 314. Section 314 states that "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." In turn, § 315 articulates the general rule that

[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

This section makes clear that, absent a special relation between the actor and the third person, the actor has no duty to control the conduct of a third person and therefore no liability attaches for the failure to control that person.[4]

---

**4.** Comment b to § 315 states in relevant part:

In the absence of either one of the kinds of special relations described in [§ 315], the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm. This is true although the actor realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself. Thus if the actor is riding in a third person's car merely as a guest, he is not subject to liability to another run over by the car even though he knows of the other's danger and knows that the driver is not aware of it, and knows that by a mere word, recalling the driver's attention to the road, he

The relations between the actor and the third person that give rise to such a duty are set forth in Restatement §§ 316–19.[5]

Section 316 provides that a parent has a duty to control the conduct of his minor child; § 317 establishes a master's duty to control the conduct of his servant; § 318 sets forth the duty of a possessor of land or chattels to control the conduct of a licensee; and § 319 deals with the duty of those in charge of persons having dangerous propensities. The latter section is the sole provision that has any conceivable application to this case.

■ Section 319, entitled "Duty of Those in Charge of Person Having Dangerous Propensities," provides in its entirety: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." The operative words of this section, such as "takes charge" and "control," are obviously vague, and the Restatement makes no formal attempt to define them. The comment to § 319, however, indicates that the rule stated in that section applies to two situations. First, § 319 applies to those situations where the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. Second, § 319 applies to those situations where the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

Illustrations appended to § 319, which concern the negligent release of an infectious patient from a private hospital

---

would give the driver an opportunity to stop the car before the other is run over.
Restatement (Second) of Torts § 315 comment b (1965).

**5.** The relations between the actor and the other that require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314 A and 320.

for contagious diseases and the escape of a homicidal maniac patient through the negligence of guards employed by a private sanitarium for the insane, provide further guidance regarding the scope of § 319. Because there are degrees of being "in charge" and having "control," these illustrations are obviously not by way of limitation. *See McIntosh v. Milano*, 168 N.J.Super. 466, 483 n. 11, 403 A.2d 500, 508–09 n. 11 (1979). These illustrations suggest, however, that § 319 has peculiar application to custodial situations. *See Prosser and Keeton, supra*, § 56 & n. 16, at 383 (indicating that the relationships discussed in § 319 "are custodial by nature").

### B.

The parties are evidently in agreement that §§ 315 and 319 are reflective of modern tort principles, and that the issue presented in this case is one of first impression in this State. Although Maryland appellate courts have made passing reference to § 315 on at least three occasions, *see Scott v. Watson, supra; Henley v. Prince George's County*, 60 Md.App. 24, 479 A.2d 1375 (1984), *cert. granted*, 302 Md. 131, 486 A.2d 173 (1985); *Furr v. Spring Grove State Hospital*, 53 Md.App. 474, 454 A.2d 414, *cert. denied*, 296 Md. 60 (1983),[6] none has ever specifically cited § 319. Moreover, we have never expressly adopted either §§ 315 or 319.

Our decision in *Scott* mentioned § 315 in the context of three questions of law that had been certified from the United States District Court for the District of Maryland under the Maryland Uniform Certification of Questions of Law Act. One of these questions was whether Maryland law imposed upon the landlord of an urban apartment

---

6. We shall not make further reference to either *Henley v. Prince George's County*, 60 Md.App. 24, 479 A.2d 1375 (1984), *cert. granted*, 302 Md. 131, 486 A.2d 173 (1985), or *Furr v. Spring Grove State Hosp.*, 53 Md.App. 474, 454 A.2d 414, *cert. denied*, 296 Md. 60 (1983). First, Henley is presently before this Court for review. Second, we consider the issue presented in Furr as not addressed by this Court.

complex a duty to tenants to protect them from the criminal acts of third parties committed in common areas within the landlord's control and, if so, the extent of that duty. In analyzing this question we recounted the basic elements necessary to state a cause of action in negligence. Applied to the landlord/tenant context we held that there is no special duty imposed upon the landlord to protect his tenants against crimes perpetrated by third parties on the landlord's premises. In a passage central to our discussion here, the *Scott* Court cited § 315 for the proposition that this general rule is merely "a subsidiary of the broader rule that a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship." *Id.*, 278 Md. at 166, 359 A.2d at 552. By virtue of our citation to § 315, we implicitly approved the analytical framework embodied within that section and, inferentially, § 319.

In our view, *Scott* suggests that § 315, which reflects the common law of this State, outlines the appropriate analytical framework for determining whether an actor has a duty to control a third person.[7] Section 319, which merely amplifies § 315, is likewise reflective of the common law. Accordingly, we expressly adopt § 319 as the law of this State governing the duty of those in charge of persons having dangerous propensities.

---

7. *See generally Felder v. Butler,* 292 Md. 174, 438 A.2d 494 (1981) (absent a statute to the contrary, third parties do not have a cause of action against a vendor of alcoholic beverages for injuries negligently caused by an intoxicated patron); *Brill v. Wilbanks,* 222 Md. 248, 159 A.2d 657 (1960) (per curiam) (declaration demurrable because it failed to show a breach of duty owed by the defendants to the plaintiff); *Liberto v. Holfeldt,* 221 Md. 62, 66, 155 A.2d 698, 701 (1959) (duty to the public created by a statute prohibiting one from leaving keys in an automobile's ignition does not "extend to all the world, but must be a foreseeable duty to a class of which the plaintiff was a member."); *State ex rel. Joyce v. Hatfield,* 197 Md. 249, 78 A.2d 754 (1951) (absent a statute to the contrary, third parties do not have a cause of action against a vendor of alcoholic beverages for injuries negligently caused by an intoxicated patron).

C.

The Lambs seek to hold the probation officers liable for not reporting the probationer's misconduct to the appropriate courts. They argue that had these officers reported this misconduct to the courts the probationer would not have been in a position to commit the tortious acts because he would have been incarcerated.

Initially, we note that the probation officers did not meet the threshold requirement of taking charge of the probationer within the meaning of § 319. The comments and illustrations accompanying § 319 suggest that an actor typically takes charge of a third person by placing him in some form of custody. The more traditional and obvious examples include a correctional institution incarcerating a dangerous criminal, *see Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984), or a mental institution confining a dangerous patient, *see, e.g., Bradley Center, Inc. v. Wessner*, 161 Ga.App. 576, 287 S.E.2d 716, *aff'd*, 250 Ga. 199, 296 S.E.2d 693 (1982); *Maroon v. State, Dep't of Mental Health*, 411 N.E.2d 404 (Ind.Ct.App.1980); *Petersen v. State*, 100 Wash.2d 421, 671 P.2d 230 (1983). The probationer in this case, of course, was not incarcerated in a correctional institution or confined in a mental hospital, nor had he been negligently released from these facilities, at the time of the 1979 automobile accident.

In our judgment, this case is more closely analogous to those decisions where courts have found that the actor did not take charge of a person having dangerous propensities within the meaning of § 319. *See, e.g., Bergmann v. United States*, 689 F.2d 789, 796 (8th Cir.1982); *Seibel v. City and County of Honolulu*, 61 Haw. 253, 259–61, 602 P.2d 532, 537–38 (1979); *Baugher v. A. Hattersley & Sons, Inc.*, 436 N.E.2d 126, 128 n. 1 (Ind.Ct.App.1982); *Sports, Inc. v. Gilbert*, 431 N.E.2d 534, 536–38 (Ind.Ct.App.1982); *Gooden v. Tips*, 651 S.W.2d 364, 370 (Tex.Ct.App.1983); *Bailey v. Town of Forks*, 38 Wash.App. 656, 688 P.2d 526, 530–31 (1984). *See generally Pursley ex rel. Clark v. Ford Motor Co.*, 462 N.E.2d 247, 250 n. 6 (Ind.Ct.App.1984)

(declining to decide whether § 319 would impose a duty on Ford because, *inter alia*, there was no evidence that Ford "took charge" of third person). A brief review of several of these cases will clarify the take charge criterion under § 319.

For example, *Bailey* involved a police officer who ordered an obviously intoxicated person (Medley) to leave a tavern and personally observed Medley get into the driver's seat of a truck. Shortly after the officer's contact with Medley, the truck collided with a motorcycle, fatally injuring the driver of the motorcycle and seriously injuring the cycle's passenger (Bailey). Bailey sued the town for negligence in failing to prevent Medley from driving his truck. Relying upon § 319, Bailey argued that the officer took charge of Medley and that the officer breached his duty to Bailey because he failed to control or prevent Medley's drunken operation of a vehicle. In rejecting Bailey's argument in a unanimous opinion, the court reasoned that the complaint failed to allege facts to support the conclusion that the officer took charge or control of Medley. Instead, the complaint merely alleged that the officer had "official contact" with Medley and ordered him to leave the tavern. According to the *Bailey* court, a duty under § 319 did not arise.

In a 1979 decision, the Supreme Court of Hawaii held that the past prosecution of a defendant for sex offenses and suspected involvement of the defendant in new offenses did not create a special relationship of a nature that would impose a duty upon the City and County of Honolulu ("city") with respect to a fifteen-year-old girl murdered by the defendant. *Seibel v. City and County of Honolulu, supra.* Factually, plaintiff's decedent was murdered by the defendant, who had a history of committing serious sex offenses. Two years before this murder, the defendant had been acquitted of various sexual offenses, abduction, and kidnapping by reason of serious diminished capacity, and granted conditional release with psychiatric care. The plaintiff brought a negligence action against the city, claim-

ing that the conditional release order rendered the city liable under the theory of respondeat superior. In rejecting this argument, the *Seibel* court noted that the city did not have custody of the murderer under the terms of the prior conditional release order.

Another example of circumstances where the actor did not take charge of the third person is a 1982 decision by the Court of Appeals of Indiana. *Sports, Inc. v. Gilbert, supra.* In that case an inebriate (Riggs) was involved in a minor automobile accident in the parking lot of a speedway. Security guards employed by the speedway permitted Riggs to leave the premises in his truck after two relatives had been summoned to accompany him; another person was driving. Later that evening, Riggs' truck collided with plaintiffs' vehicle. At the time of the collision, Riggs was driving. The plaintiffs brought an action for wrongful death and personal injuries against the owners of the speedway alleging that the speedway was negligent in allowing Riggs to leave the premises. The *Gilbert* court denied recovery under § 319, reasoning that the speedway employees never took charge of Riggs within the meaning of that section. In the course of its opinion, the court acknowledged that a majority of jurisdictions follows the Restatement principles concerning the duty to control the conduct of a third person. *Id.,* 431 N.E.2d at 537.

The momentary contact between the actor and the third person in *Bailey* and *Gilbert* was an important consideration in finding that the actor did not take charge of the third person. But this consideration does not necessarily compel the conclusion that temporal proximity is the decisive factor in determining whether an actor has taken charge of a third person. Here, the relationship between the probation officers and the probationer was continuing in the sense that the probationer was placed on probation for an extended period of time. However, that does not mean that the officers had taken charge of the probationer. The probationer was essentially free to conduct his day-to-day affairs, and was responsible for reporting certain activities

to his probation officers as they arose or as they were scheduled. In addition, unlike in the more typical custodial situations, the officers were evidently not responsible for supervising the probationer on a daily basis. Therefore, because there was no custodial relationship involved in this case, we conclude that the officers did not take charge of the probationer.

A minority of courts have challenged the proposition that an actor can take charge of a third person only in a custodial situation. *See, e.g., Liuzzo v. United States,* 565 F.Supp. 640 (E.D.Mich.1983); *see also Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307 (Tex.1983) (imposing a duty on employer to control the conduct of its intoxicated employee when the employer "takes charge" of the employee outside the usual employer-employee relationship). However, a cursory glance at these cases indicates that they involve highly unusual factual situations. For example, *Liuzzo* involved a civil rights activist who was shot and killed by the occupants of a passing vehicle while she was driving her automobile between Selma and Montgomery, Alabama. The occupants of the vehicle from which the fatal shots were fired were members of the Ku Klux Klan. An occupant of the Klan vehicle included a Federal Bureau of Investigation (FBI) informant. The estate of the civil rights activist brought suit against the United States under the Federal Tort Claims Act, alleging that the FBI agents who directed the informant were negligent in directing the informant to accompany the other Klansmen on this particular trip. In applying § 319, the *Liuzzo* court found that the methods of operation with informers at the time approved by the FBI involved the type of control or "take charge" suggested in § 319. Specifically, the informant became involved in Klan activities at the direction of his supervising FBI agent, and the informant made reports on what he discovered. As a result, the government benefited from his activities. Despite the finding of a § 319 duty, however, the federal

district court did not find the government liable because the directing FBI agent had acted reasonably, not negligently. Unlike in those non-custodial cases, the probation officers in the case *sub judice* did not direct the activities of the probationer to the degree that the FBI directed those of the informant, nor did the officers otherwise "take charge" of him.

The Lambs direct our attention to a host of cases involving psychotherapist-patient relationships, *see, e.g., Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185 (D.Neb.1980), and the negligent release of patients from psychiatric institutions, *see, e.g., Petersen v. State, supra.* These cases are inapposite because the instant case does not involve this particular relationship nor this type of release. Appellants' reliance upon *Semler v. Psychiatric Institute of Washington, D.C.*, 538 F.2d 121 (4th Cir.), *cert. denied sub nom. Folliard v. Semler*, 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976), is similarly misplaced. In *Semler*, the mother and administratrix of a deceased minor brought suit against the psychiatric institute and psychiatrist to recover for the killing of her daughter by a patient. Although the patient was under a state court order to receive treatment, he was transferred to outpatient status without the state court's approval. The psychiatric institute and the psychiatrist filed a third party complaint against the probation officer who approved the transfer. In affirming the judgment in favor of the plaintiff, the United States Court of Appeals for the Fourth Circuit held that the state court order requiring that the patient remain confined imposed a duty on the institute to exercise reasonable care in protecting the public from the patient. In the language of the Restatement, the probation order created a special relationship. As a result, neither the probation officer nor the institute could release the patient without prior court approval. Unlike in the instant case, however, the state court order in *Semler* created a special relationship that imposed a duty upon the

institute to protect the public by retaining custody over the probationer.

## II

The Lambs, asserting that they do not place exclusive reliance upon § 319, contend that two alternative sources impose a duty upon the probation officers: (1) the probation orders; and (2) Md.Code (1957, 1984 Cum.Supp.), Art. 41, § 124. We disagree.

### A.

Two probation orders are involved in the Lambs' argument. The Circuit Court for Frederick County issued an order for probation on August 8, 1975, and the District Court of Maryland issued a probation order on December 1, 1978. The Circuit Court order provided in pertinent part:

It is ORDERED, this 8th day of August, 1975, by the Circuit Court for Frederick County, Maryland, by virtue of the authority conferred upon it by the laws of the State of Maryland, that ... the execution of the sentence of 5 years in Div. of Corrections has been suspended, for the offense of robbery and the Defendant is hereby placed on Probation ... under supervision of the Maryland Division of Parole and Probation, ... for a period of 5 years, ... subject to the following conditions:

1. Report to his Probation Agent as directed and follow his Lawful instructions;

\*　　\*　　\*　　\*　　\*　　\*

3. Get permission from his Probation Agent before:

\*　　\*　　\*　　\*　　\*　　\*

c. owning, possessing, using or having under his control any dangerous weapon or firearm of any description (is prohibited);

\*　　\*　　\*　　\*　　\*　　\*

4. Obey all laws;

5. Notify his Probation Agent at once if arrested;

* * * * * *

8. Shall not illegally possess, use or sell any narcotic drug, "controlled dangerous substance" or related paraphernalia; [and]

* * * * * *

10. Special conditions as follows:

* * * * * *

2. That he participates in and comply with program relating to alcoholism recommended by Mental Health Clinic.

The District Court order placed Newcomer on one year of probation effective December 1, 1978. The conditions of this probation order mirrored those of the Circuit Court probation order, with the exception of condition 10.

These orders merely obligated the probationer to comply with various conditions at the risk of being charged with a probation violation. By their nature, they simply impose a duty upon the probation officers to notify the court of any probation violations. These orders do not of necessity forecast the probationer's incarceration even if a violation is found to exist by the court. In any event, however, the duty the probation officer owes to the court is not extended to the general public, i.e., the Lambs.

## B.

■ The Lambs further contend that the supposed duty of the probation officers arises from § 124 of Art. 41, which provides in pertinent part:

(a) Whenever any court shall suspend the sentence of any person convicted of crime, and shall direct such person, to continue, for a certain time, or until otherwise ordered, under the supervision of the Division, it *shall be the duty of the said Division to supervise, when so requested by said court, the conduct of such person and*

*to ascertain and report to said court whether or not the conditions of such probation or suspension of sentence are being faithfully complied with by such person.* [Emphasis supplied.]

Here again, it is clear that the duty specified in § 124 runs from the supervising officer to the court, not from the supervising officer to the general public. We therefore reject the Lambs' statutorily based argument.

### III

The Lambs vigorously contend that the supposed duty of the probation officers under § 319 is owed to "anyone, readily identifiable or not, who, as a result of the failure to exercise due care in controlling the person, is foreseeably harmed by that person." In making this contention the Lambs overlook that a duty must first exist before a court can determine to whom the duty is owed. In this case we have determined that the probation officers were under no duty to control the probationer because they had not taken charge of him under § 319. Hence, we find it unnecessary in this case to determine to whom a § 319 duty is owed. Likewise, we find it unnecessary to reach the proximate causation issue because of our holding that the probation officers owed no duty to the Lambs.[8]

We therefore affirm the judgment of the Circuit Court for Frederick County.

JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED.

APPELLANTS TO PAY THE COSTS.

---

**8.** Since oral argument the parties have directed us to two cases. *See Acevedo v. Pima County Adult Probation Dep't,* 142 Ariz. 319, 690 P.2d 38 (1984) (discussing immunity of probation officers); *Orzechowski v. State,* —— R.I. ——, 485 A.2d 545 (1984) (discussing distinction between public and special duty). Our review of these cases reveals that neither is helpful in the resolution of the issue before the Court.