**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 748

September Term, 2012

_____

MELISSA RODRIGUEZ, et al.

v.

STATE OF MARYLAND

---

Meredith,
Hotten,
Rodowsky, Lawrence F.,
    (Retired, specially assigned),

JJ.

---

Opinion by Meredith, J.

---

Filed: August 27, 2014

Melissa Rodriguez and Philip E. Parker, Sr., appellants, are the parents of the late Philip E. Parker, Jr., who was an inmate murdered by another inmate on February 2, 2005. Appellants brought suit individually and on behalf of their deceased son's estate against the State of Maryland (an appellee and cross appellant), and various persons who were State officials whom the appellants alleged bore responsibility for their son's death. In addition, appellants sued five correctional officers who were transporting inmates via bus when the assault and murder of appellants' son occurred. A twelve-day jury trial in the Circuit Court for Baltimore City resulted in a verdict in favor of appellants in the aggregate amount of $18.5 million, but the grant of certain post-trial motions resulted in the entry of judgments in a smaller amount. The trial court struck the jury's finding of gross negligence on the part of one of the individual defendants — Sergeant Larry Cooper, another appellee — and the court entered judgment in favor of all individual defendants pursuant to the doctrine of public official immunity and the immunity for State personnel under the Maryland Tort Claims Act ("MTCA"). The court entered judgment in favor of appellants against only the State. The court concluded that the State was liable for three separate claims (*i.e.*, the survival action and a wrongful death claim for each parent), and the court entered judgment for $200,000 for each of the three appellants. Appellants noted the instant appeal. The State noted a cross-appeal, and contends that appellants are entitled to a single judgment of no more than $200,000.00 in this case.

## QUESTIONS PRESENTED

Appellants present four questions for our consideration:

1. Whether the trial court committed reversible error in striking the jury's finding of gross negligence as to Sgt. Cooper?

2. Whether the trial court committed reversible error in applying qualified immunity to protect the individual defendant, Sgt.Cooper?

3. Whether the State remains liable for the full, uncapped amount of the award?

4. Whether the MTCA's cap on damages is unconstitutional, both on its face and as applied in this case?

The State's cross-appeal asks:

1. Does the MTCA limit recovery in this case to no more than $200,000?

With respect to the claims against Sgt. Cooper, we conclude that, because there was sufficient evidence of gross negligence on the part of Sgt. Cooper to have supported the jury's finding on that issue, the trial court erred in striking that part of the jury's verdict. We further conclude that the trial court erred in ruling that there was no special relationship between Sgt. Cooper and the inmates. Consequently, the trial court also erred in concluding that Sgt. Cooper was immune from liability and entering judgment notwithstanding the verdict in favor of Sgt. Cooper. Because Sgt. Cooper's tortious conduct was gross negligence, he was not entitled to immunity under the MTCA; and, because Sgt. Cooper owed a duty arising out a special relationship with the inmates in his custody, he was not entitled to common law public official immunity. We will remand the case for further consideration of any other arguments that would permit a remittitur of the verdicts returned against Sgt. Cooper. (Because no party briefed any issue regarding the applicability of the

2

general cap on non-economic damages pursuant to Maryland Code, Courts & Judicial Proceedings Article ("CJP"), § 11-108, we express no opinion on that issue.)

With respect to the claims against the State, we do not reach appellants' argument that the State is liable for the full, uncapped verdict; that argument was neither raised in, nor decided by, the trial court. We reject the appellants' argument that the MTCA's $200,000 limit on the State's waiver of sovereign immunity is unconstitutional.

With regard to the State's cross-appeal, we hold that the trial court erred in entering three judgments against the State in the amount of $200,000 for each of the appellants. We agree with the State's contention that appellants are entitled to collect no more than $200,000 from the State pursuant to the MTCA.

**FACTS AND PROCEDURAL HISTORY**

On February 1, 2005, several inmates who were incarcerated at the Maryland Correctional Adjustment Center (hereafter referred to as "Supermax") in Baltimore, were transported by bus to Hagerstown to participate in a hearing at which inmate Kevin Johns was to be sentenced for the murder of a cellmate, committed while Johns was already serving a sentence for another murder. In 2002, Johns had murdered his maternal uncle, nearly decapitating him. For that murder, Johns was sentenced to 35 years' incarceration, and sent to the Maryland Correctional Training Center (hereafter "Hagerstown Correctional Center") in Hagerstown. While incarcerated in the Hagerstown Correctional Center, Johns stomped

3

his 16-year-old cellmate to death. After he was convicted of that second murder, he was incarcerated in Baltimore at Supermax pending sentencing.

On February 1, 2005, Johns and three other Supermax inmates were transported to Hagerstown for Johns's sentencing hearing in the Circuit Court for Washington County. The other three inmates, who testified on Johns's behalf at the hearing, were: Bradford Diggs, James Folk, and the appellants' son, Philip E. Parker, Jr.

Johns was sentenced to life without the possibility of parole for the murder of the cellmate. After the sentencing hearing, the four Supermax inmates were placed on a bus and taken to Hagerstown Correctional Center for a brief period to await transportation back to Baltimore by correctional officers a few hours later. During that bus ride to Baltimore, Johns would murder Philip E. Parker, Jr.

Two guards from Hagerstown Correctional Center — Bradley Hott and B.J. Vest — later submitted reports in connection with the internal investigation conducted after Parker was murdered. Officers Hott and Vest had transported the Supermax inmates from Hagerstown Correctional Center to the Circuit Court for Washington County for Johns's sentencing hearing, and back again to Hagerstown Correctional Center once the hearing was over to await the ride to Baltimore. Officer Hott's report indicated that Johns started laughing when he was sentenced to life without parole, and Johns later commented that "the killing [had] just begun."

4

Officer Vest's report was similar to Hott's, but provided greater detail as to Johns's threats to kill again. The report stated: "Officer Vest advised that Inmate JOHNS made the following comments, 'Gonna be trouble when I get back to Baltimore. They think its [sic] bad now, the killing has just begun. I'll be back in court for these charges for the rest of my life. They will have to put me to death to end this.'" Neither Officer Hott nor Officer Vest reported these comments immediately to superiors in their chain of command because both officers regarded such comments as "not uncommon for an inmate in [Johns's] situation." Nor was anything in this regard reported to the transportation team from Baltimore when it arrived to transport the Supermax inmates back to Baltimore.

Shortly before 3 a.m. on the morning of February 2, 2005, the prisoners boarded a "prison bus" owned by the State. Bus #2809 was a "relatively new" Bluebird bus that had been modified for the transport of prisoners. The front and rear of the bus were equipped with secured compartments in which correctional officers traveled. The officers' compartment in the rear of the bus was elevated to permit a better view of the interior of the bus. Bus #2809 was fully loaded on the night in question. It carried 36 inmates and five correctional officers, one of whom acted as the bus driver.

Bus #2809 was staffed, as mentioned above, by five correctional officers. Corporal Charles Gaither was the bus driver. Cpl. Kenyatta Surgeon sat in the front of the bus directly behind the driver. Cpl. Earl Generette sat in the front of the bus, across the aisle from Cpl. Surgeon. Cpl. Robert Scott and Sgt. Larry Cooper — the Officer in Charge — sat in the

5

elevated cage in the back of the bus. Seven and one-quarter feet in front of the elevated cage was the last bench seat in the passenger compartment of the bus. The passenger compartment itself was locked, and enclosed by a plexiglass and metal honeycombed grate.

The five officers had various responsibilities prior to loading the inmates onto the bus. One of Cpl. Surgeon's responsibilities was to apply three-point restraints — consisting of handcuffs, a lockbox, and a belly chain — to Johns. Cpl. Surgeon did not secure these restraints properly, as the internal investigation later found, with the result that Johns had much more freedom of movement of his arms than he should have had.

When it was time to board the bus, the Supermax inmates seated themselves on two bench seats in the very rear of the bus, directly in front of the officers' elevated compartment. This was a violation of a policy of the Maryland Department of Public Safety and Correctional Services which provided that Supermax inmates were to ride in one of the two enclosed security cages in the front of the bus. Although none of the officers testified that they were even aware of this policy, several officers testified that the two security cages were otherwise occupied on this particular trip.[1] One security cage contained an immigration detainee who was required to ride separately from the other State prisoners on the bus. The other cage contained an inmate who had requested to be put in isolation to get away from the four Supermax inmates, with whom he said he had been "beefing."

---

[1] The State notes in its brief: "Unaware of that policy, the transportation detail did not intervene when the four [Supermax] inmates selected seats near each other in the rear-most compartment."

6

The bus departed from Hagerstown Correctional Center shortly before 3 a.m., with Johns and Folk seated on the last bench directly in front of the elevated cage occupied by Cpl. Scott and Sgt. Cooper. In the seat in front of Johns and Folk, at the window, was Philip Parker. Seated next to Parker was Bradford Diggs. During the ride to Baltimore, Diggs got up from his seat and moved across the aisle, leaving the space next to Parker unoccupied. It is a violation of policy for inmates to get up and move around the bus, but none of the guards took corrective action in response to Diggs's movement.

At some point during the trip, Johns got up from his seat, reached over the seat in front of him, and strangled Parker. After a time, Johns got up again, moved into the seat next to Parker, and continued strangling him. He also slashed Parker's neck with a razor blade that had somehow been smuggled onto the bus.[2]

At a motions hearing in connection with Johns's trial regarding Parker's murder, inmate Patrick Cook, who was on the bus the night of the murder, testified that he saw Johns murder Parker. Cook provided the following description:

[BY COUNSEL]:   How could you see what happened if it was dark?

[BY COOK]:      Because I could see by the, you know, it wasn't really cloudy out or anything. It was just, you know, if I remember correctly, the skies were fairly clear and it was starry. And at certain overpasses there's, you know, lights that shine in the bus windows.

---

[2]The State notes in its brief that, before boarding the bus in Hagerstown, "the inmates were strip-searched by Officers Scott and Generette," and the bus itself was searched by Officer Gaither "for contraband and weapons," but the razor blade with which Johns later slashed Parker's neck was not discovered.

Q      Okay. Can you explain to me what you observed the Defendant [Johns] do and where those acts occurred?

A      As we were coming down Route 70, right as we got past where Route 40 splits off of Route 70 coming in Marriottsville — where Marriottsville Road is, the Defendant and the victim were — they were talking all the way down the road.

When we got to where Marriottsville Road is, there's a bridge right between where Route 40 splits off and Marriottsville Road is and there's a slight bend there.

The Defendant stood up and used his arm to hook the victim and pull his head back over the seat in front of him and kept pressure on him the whole time, and choking him out.

He held him until we got roughly to where Route 29 is, when the victim stopped moving around. Once we crossed over the bridge at the Patapsco River, the Defendant got up out of the seat that was in front of me and moved up into the same [seat] with the victim and grabbed ahold of him again, because the victim started to move.

And, again, clutched him with his arm and choked him out. By the time we reached the Baltimore Beltway, the victim wasn't moving anymore, and when we got down to the park and ride, the victim wasn't moving at all.

I saw that when the Defendant got up out of the seat to move up into the seat with the victim, the man that was sitting in the seat with the victim got up and slid back to the seat that's directly across from me, because there was only one inmate in that seat.

As the victim [sic] was getting up, the boy that was sitting in the seat with the Defendant handed him razor blades. He spit them out of his mouth and handed them to the Defendant.

And then, as I said, as the Defendant got up and got in the seat with the victim, he was choking him out, he used the razor blades to cut his neck.

8

And the whole time all of this was going on, he was saying, this is what I do best. This makes my dick hard.

By the time we come around out of the park and ride on to the exit to go on to Cooks Lane, the DOC [Department of Corrections] officers flipped the lights on in the bus to see what was going on.

At that time the Defendant had the victim pushed down in between the seats where he couldn't be seen and he — the boy that was sitting directly in front of me slid to the middle of the seat to block the view of the DOC officers in the back of the bus.

Mr. Cook's testimony is the most detailed account of what happened to Mr. Parker. All five of the correctional officers on board the bus claimed not to have seen the assault. Even Cpl. Scott and Sgt. Cooper — who were seated only seven feet from where it occurred — denied witnessing the assault.

The evidence established that, at the time of the assault, the interior lights of the bus were off, and music was playing. Cpl. Generette was riding in the front of the bus. He testified that he neither saw nor heard anything amiss, and did not realize there might be a problem until he received a call from Cpl. Scott on the internal bus phone. Cpl. Generette testified:

[BY COUNSEL FOR THE STATE]: Did there come a time during the trip back to Baltimore then when something unusual occurred?

[BY CORPORAL GENERETTE]: Yes, sir. I got a call from Officer Scott.

Q. And how did you get that call?

A. We have a — it was an internal phone within the bus. You couldn't call out on it, just from the back to the front.

9

Q.    All right. And what did Officer Scott tell you when he called? Did you answer it?

A.    Yes, sir, I did.

Q.    What did Officer Scott tell you?

A.    He said to me that the guy with the crazy hair [Johns] or just got up and moved around. He said they're back here playing around, whatever and he said can — he asked me could I see anything and at that point I had Officer Gaither turn the light on the bus and I looked back to the guy he was talking about because I knew he was talking about the crazy guy's hair, these twisty things in his head. So when I looked back on the bus he was sitting back in his chair with his head laying back like this looking at the ceiling of the bus.

Q.    Now did you use anything besides the interior bus lights to see him?

A.    No, sir. When the bus lights were on I could see like the tops of the — it's kind of hard, but I could see the tops of their heads and I knew where they were sitting at so I know — I knew where two were at.

Q.    And at the time you looked back there you've just described what you saw that inmate doing.

A.    He had his head back on the chair with his head looking up towards the ceiling just sitting there.

Q.    Did you see anything unusual occurring at that time?

A.    No, sir, I didn't.

Cpl. Scott, who was in the back of the bus, described what prompted his call to Cpl. Generette:

[BY COUNSEL FOR THE STATE]: Okay. Did there come a time when something caught your attention?

[BY CORPORAL SCOTT]: Yes, ma'am.

10

Q. Can you please tell the jury about that?

A. Well, I saw inmate Johns get up from his seat and move around to the seat in front of him.

Q. What did that mean to you?

A. At the time it didn't mean anything because inmates move all the time.

Q. Are they supposed to?

A. They're not supposed to, but we very rarely say anything to them about it because it's nothing we can do.

Q. Okay. You rarely say anything to them because why?

A. There's nothing we can do.

Q. And what do you mean by that?

A. I could tell them to sit down, but I can't physically go in there and make them sit down.

Q. Okay. And so what does that put you in a position of?

A. Huh?

Q. So what does that mean — how does that affect you?

A. Basically it didn't affect me until I found it was something going on.

Q. And when you saw inmate Johns move, can you tell the jury what you saw?

A. Well, I saw inmate James Folks [*sic*] slide to the side so he can get past. He moved around to the seat in front of him and he started leaning over like towards the window and he started moving doing something, but I couldn't see what he was doing.

11

Q.    Okay.  So what did you do at that point?

A.    I asked — as soon as he did that I picked up the phone, I called [Generette] to the front, I told him that I seen inmate move from one seat and go to the seat in front of him and I asked him if he could see anything.

Q.    Then what happened?

A.    He was shining his light and myself and Officer — Sergeant Cooper was shining our lights.  Basically it was lights going back and forth.  I think he told Officer Gaither to cut the lights on, but to me it looked like it wasn't even any light on.  It's like if somebody had a cigarette lighter.  That's how much light was in the bus.

Q.    What did you do with your flashlight?

A.    I was trying to shine in between the window and the seat to see if I could see him moving.

Q.    And did you see anything at that point?

A.    I was — I saw a blue shirt in between the window and the seat.

Q.    And what seat would that be?

A.    That was one — three seats in front of me.

Q.    And did the blue — what did you see, a blue shirt?

A.    What appeared to be a blue shirt because — yes, either a blue shirt or a blue jacket.

Q.    Did that mean anything to you?

A.    At that time, no.

Q.    Why didn't it mean something to you?

A.     Because inmates wear blue — blue shirt like pullover shirts and blue jackets. The shirt wasn't moving, but that's all I could see when he was laying down was a blue shirt.

Q.     So you thought somebody – you saw – just what did you say again?

A.     I said I couldn't see what it was. I seen a blue shirt or a jacket, but I couldn't see what inmate Johns — I mean Johns was doing at the time.

Despite the fact that Cpl. Scott testified that he could not see anything definitive, Cpl. Scott was suspicious enough that he told Cpl. Generette that all the officers should "go into the back of the bus as a team" when the bus arrived at Supermax "[b]ecause I didn't know if the inmates back there were planning something or if they were already doing something in the back."

Cpl. Scott's seatmate in the back of the bus was also the Officer in Charge during the bus ride, Sgt. Larry Cooper. Pursuant to Departmental policy, the Officer in Charge should have been seated in the front of the bus. During the internal investigation of this incident, Sgt. Cooper admitted that he was unaware of this policy, along with several other Departmental policies. Sgt. Cooper's testimony at trial was, essentially, that he did not see anything, and could not explain why he did not see anything:

[BY THE STATE]: Now at that time, early February of 2005, was it the practice to drive to Baltimore with interior lights on or off?

[BY SGT. COOPER]: No, it was never the practice to drive back with — with the lights on. It was always off[;] unless you had reason to turn them on they stayed off.

Q.     With the lights off were you able to see into the rear compartment?

13

A.      You could not see clearly, but you could just see images of people. You couldn't see exactly who it was or, you know, pretty much what was going on.

* * *

Q.      . . . in looking into the rear compartment of the bus, were you able to see silhouettes of persons?

A.      Yes.

Q.      Were you able to see person's movements?

A.      It's — sometimes.  It depends on actually where you were on Route 70 coming back down because it's — there's no lights on the highway there and it's — when it's pitch black it's dark.

Q.      Did you have flashlights?

A.      Yes, we did carry flashlights.

On cross-examination, Sgt. Cooper was asked to provide more details about the bus ride, but he was never able to explain why he failed to see the assault and murder of Philip Parker, Jr., which took place just a few feet in front of him. His testimony included the following exchange:

[BY COUNSEL FOR APPELLANTS]:  . . . Were you aware that the officers on the bus, including yourself were to remain alert and observant at all times and report any unusual occurrence to the O[fficer] I[n] C[harge]?

[BY SGT. COOPER]:  Yes.

Q.      And Officer Scott reported to you that something had happened; did he not?

A.      He reported that he saw something.

14

Q.    Unusual?

A.    Yes.

Q.    Did you ask him what he saw?

A.    I believe I did.  Whatever was in my report.[3]

Q.    What did he tell you that he saw?

A.    I don't remember at this time.

Q.    What did you do as a result of him telling you that he saw something?

A.    I think we turned — whatever he told me I think we turned the lights on and checked.

Q.    And at that point you now know the person to be Kevin Johns had his head over the seat?

A.    I'm not understanding what you're asking me.

Q.    When you turned the lights on, I believe you also indicated you shined your flashlight?

A.    Yes.

Q.    And you shined it on the top of the seat?

A.    I shined it inside the back of the bus.  I don't – I don't – I can't say whether it was on top of the seat or —

Q.    Did you see Kevin Johns, now you know to be Kevin Johns with his head over the seat?

---

[3] An internal investigation was launched in the early-morning hours of February 2, once the bus arrived back at Supermax and Mr. Parker was taken to the hospital, where he was pronounced dead.  The correctional officers on the bus were separated and directed to write a report of the bus trip; the report was called a "Notice of Incident/Matter of Record."  Cooper's report mentions nothing about any conversation between himself and Scott.

15

A.    Yes, looking up.

Q.    Looking at the ceiling?

A.    Yes.

Q.    So that you would have had your flashlight where you could see his head; was that correct?

A.    I saw one — I saw a person with their head back up in the air, yes.

Q.    Leaning on the seat?

A.    Yes.

Q.    And did you see any blood on the top of the seat, sir?

A.    No.

Q.    Let me ask you this, can you tell me, how far were you from the nearest inmate to you when you were seated in the cage?  This close?

A.    There was some inmates sitting in a seat that was to the right of me or right in front of me to the right, I know that.  And there was inmates —

Q.    How far were they?

A.    They could have — those inmates could have been — I'm really not sure.  I'm guessing.

Q.    If I told you the first seat or the second seat was some five feet away from you, would you disagree?

A.    I couldn't disagree because I don't know.

Q.    Okay.  And if I told you that Mr. Parker was seated seven feet away from you, would you disagree with that?

A.    I couldn't disagree with that because I don't know.

16

Q. What was Officer Scott doing on the trip while you were eating your dinner?

A. He wasn't doing anything that I could recollect.

Q. If you — do you know what the word direct observation means, sir?

A. It would — I would — I would think that it means direct — directly observing.

Q. Does that mean to look constantly, sir?

[BY THE STATE]:  Objection.

[BY THE COURT]:  If he knows.  It calls for some kind of almost nebulous opinion, but I'll allow the witness to answer the question.

[BY SGT. COOPER]:  I'm not real sure about what you mean.

[BY APPELLANTS' COUNSEL]:  Did you have direct observation, as you understand it, on all four [Supermax] inmates for the entire trip on February 1st and 2nd, return from Hagerstown?

A. Did I have direct observation as I see it?

Q. As you understand the words to mean.

A.  As I understood it, yes[.]

Q. So you were directly watching the whole time?

A. I was watching inside the back of the bus.  Whether I was looking at, you know, who I was looking at was not, you know — I don't know.

Q. Did you see any of the inmates get up?

A. No, I did not.

Q. Did you see any inmates change their seat?

17

A.    No, I did not.

Q.    Do you now know that inmates got up during the trip?

A.    Yes.

Q.    Can you explain to the ladies and gentlemen of the jury how you didn't see that?

A.    You want me to explain how I didn't?

Q.    Yes, sir.

A.    I didn't see it.

Q.    Was it dark?

A.    Yes.

* * *

Q.    As you returned from Hagerstown, if you couldn't see all the inmates, did you think you could see better with the lights on in the trip back from Hagerstown, sir?

A.    Possibly.

Although Sgt. Cooper claimed that he did not see anything particularly troubling in the back of the bus, Cpl. Gaither, the driver, testified that Cpl. Generette relayed to him that Cpl. Scott "said something was going on" in the back of the bus. With the bus lights out, Cpl. Gaither "picked up the pace a little bit" and proceeded to Supermax.

When the bus arrived at Supermax, the inmates were called off the bus one at a time, with the four Supermax inmates called first.  Diggs and Folk were called and exited the bus. Next, Johns was called.  His shirt was observed to be bloody, and he had a cut on his arm.

18

Cpl. Surgeon took Johns inside Supermax. Philip Parker's name was then called. After he failed to reply, he was found unconscious on the bus, wedged between his seat and the bus window. Cpl. Scott and Cpl. Gaither had to remove his restraints to pull him out from under the seat. The officers carried Parker to the front of the bus, where Cpl. Gaither administered three rounds of CPR until EMTs arrived. At that point, Cpl. Gaither and Cpl. Scott carried Parker off the bus, and the EMTs took over. Photographs introduced at trial demonstrated that there was blood smeared on top of the seat back and in the seat portion of the bench seat in which Philip Parker was sitting when he was murdered.

Battalion Chief (then Lieutenant) Theresa Harp of the Baltimore City Fire Department EMS service testified that she was summoned to Supermax at approximately 4:00 a.m. on the morning of February 2, 2005. She found Philip Parker "unresponsive and in cardiac arrest" when she arrived, and he was being worked on by other EMS personnel. Eventually, Philip Parker was transported to Mercy Hospital, where he was pronounced dead at 4:57 a.m., without ever having regained consciousness. The official cause of death was determined to have been strangulation.

An internal investigation was launched, which resulted in the terminations from State service of Cpl. Surgeon and Cpl. Scott. Both terminations were upheld on appeal. Sgt. Cooper also was going to be terminated for his role in these events, but he opted instead to retire. Cpl. Gaither and Cpl. Generette were also disciplined; each was given an official reprimand, with Cpl. Generette also receiving a five-day suspension without pay. The

19

disciplinary documents, including Notices of Termination, generated by the internal investigation were admitted, over the State's objection, at the trial of this matter.

After providing timely notice pursuant to the Maryland Tort Claims Act, appellants filed a complaint and jury demand on May 15, 2006, naming as defendants: the State of Maryland; Mary Ann Saar, then-Secretary of the Department of Public Safety and Correctional Services; Frank C. Sizer, Jr., then-Commissioner of Corrections; Lehrman Dotson, then-Warden of Supermax; and the five individual correctional officers identified above who staffed the bus. The suit was brought by appellants Melissa Rodriguez, individually and as personal representative of Philip Parker, Jr.'s estate, and Philip Parker, Sr. The original complaint included six counts. Count 1 asserted a claim pursuant to 42 U.S.C. § 1983 for violation of Philip Parker, Jr.'s rights under the Eighth and Fourteenth Amendments to the United States Constitution. Count 2 alleged that the defendants violated Philip Parker, Jr.'s rights under Articles 24 and 26 of the Maryland Declaration of Rights. Count 3 alleged wrongful death. Count 4 was a survival action. Count 5 alleged assault and battery against the individual officers in connection with their actions after the bus arrived back at Supermax. And Count 6 sought funeral expenses.

On June 29, 2006, the State removed the case to federal court. On February 8, 2008, the State filed a motion to dismiss or, in the alternative, for summary judgment. On April 30, 2008, appellants filed their response, along with their own motion for summary judgment. A motions hearing was held on July 25, 2008, and on July 31, 2008, the United States District

20

Court for the District of Maryland granted the State's motion for summary judgment and dismissed, with prejudice, the federal claims. The order further provided that the federal court would decline to exercise supplemental jurisdiction over the state law claims, and the court remanded those claims to the Circuit Court for Baltimore City. Because the parties to this appeal disagree on the import of the federal court's memorandum opinion which was filed with the order, we will discuss it in more detail later in this opinion.

Following remand to the Circuit Court for Baltimore City, the case was stayed while appellants pursued an appeal, ultimately unsuccessfully, to the United States Court of Appeals for the Fourth Circuit. In early 2011, the Circuit Court for Baltimore City issued a scheduling order providing that trial would begin on October 11, 2011. As scheduled, trial proceedings took place on October 11-14, 17-21, and 24.

On October 24, the jury returned its verdict, responding as follows to the questions submitted. The jury found that Cpl. Scott, Cpl. Surgeon, Cpl. Gaither, and Sgt. Cooper had been negligent, and that the negligence of each was a proximate cause of Mr. Parker's death. The jury found Cpl. Generette not to have been negligent at all. The jury found that, of the five officers, Sgt. Cooper alone had also been grossly negligent. The jury also answered in the affirmative the question of whether it found that "any employee of the State of Maryland in addition to the above named individual correctional officers was negligent toward Philip E. Parker, Jr.," and whether that negligence was a proximate cause of Mr. Parker's death. In addition to awarding appellants $15,000.00 in funeral expenses, the jury awarded non-

21

economic damages to Mr. Parker's estate in the amount of $10,000,000.00, non-economic damages to the father in the amount of $1,000,000.00, and non-economic damages to the mother in the amount of $7,500,000.00.

Timely post-trial motions were filed by the defendants. By reference to docket entries, we glean that, on November 1, 2011, the defendants filed two motions for remittitur, a motion for judgment notwithstanding the verdict as to the jury's finding that Sgt. Cooper had been grossly negligent, and a motion for judgment notwithstanding the verdict as to all individual defendants, asserting the immunity of the individual defendants under both common law public official immunity and the Maryland Tort Claims Act.[4] Appellants filed oppositions to the motions, the defendants filed responses to the oppositions, and finally, on April 9, 2012, a hearing was conducted.[5]

On June 8, 2012, the two orders that have prompted this appeal and cross-appeal were docketed. Those orders: 1) struck the jury's finding of gross negligence as to Sgt. Cooper, 2) recognized the immunity from liability of all individual defendants, including Sgt. Cooper, "under both Public Official Immunity and the Maryland Tort Claims Act, Maryland Code,

---

[4]The motion for judgment notwithstanding the verdict does not appear in the record. Instead, where it should appear, there is a paper, apparently inserted by the Clerk of the Circuit Court for Baltimore City prior to the transmittal of the record to this Court, recognizing that this filing was docketed as Document #63, but it is now "MISSING," and "Attempts to obtain copies have been unsuccessful." The two motions for remittitur also are not in the circuit court's record; instead, a paper noting that they are "MISSING" appears in the court's file.

[5]We were provided no transcript of the hearing.

State Government Article § 12-104(a)," 3) entered judgments notwithstanding the verdict in favor of each of the individual defendants, including Sgt. Cooper, 4) ruled that there were three claims under the Maryland Tort Claims Act, and granted remittiturs of the jury's awards of compensatory damages to $200,000 for each of the three appellants, and 5) entered judgment in the amount of $200,000 in favor of each of the three appellants ($600,000 in the aggregate) against only the State.

Timely appeals were noted to this Court by both sides. Appellants argue that the trial court erred in striking the jury's finding of gross negligence as to Sgt. Cooper, finding that immunity protected Sgt. Cooper from liability, and in remitting the jury's award in any amount. Appellants also argue that the limit on damages in the Maryland Tort Claims Act is unconstitutional, both on its face and as applied in this case. In the State's cross-appeal, it contends that the court erred in remitting the award to $600,000.00; the State asserts that the total amount collectible under the MTCA is limited to $200,000.00 for all appellants collectively.

## DISCUSSION

### I. Gross Negligence

The term "gross negligence" has been described as an amorphous concept, resistant to precise definition. In *Barbre v. Pope*, 402 Md. 157, 187 (2007), the Court of Appeals recognized that "[i]ssues involving gross negligence are often more troublesome than those involving malice because a fine line exists between allegations of negligence and gross

23

negligence." "Gross negligence has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or for the rights of others.'" *Foor v. Juvenile Services Admin.*, 78 Md. App. 151, 170 (quoting *White v. King*, 244 Md. 348 (1966)). It has also been described as

> an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985) (quoting *Romanesk v. Rose*, 248 Md. 420, 423 (1968)).

"Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case. It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached." *Romanesk, supra*, 248 Md. at 423 (citation omitted). Courts have said that the question of whether a defendant's conduct rises to the level of gross negligence is a question for the trier of fact to decide: "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Taylor v. Harford County Dept. Of Social Services*, 384 Md. 213, 229 (2004) (quotation marks and citations omitted). *See also Artis v. Cyphers*, 100 Md. App. 633, 652 (1994).

24

In the present case, the trial court gave two reasons for granting the judgment notwithstanding the verdict as to the jury's finding of gross negligence on the part of Sgt. Cooper: (1) because "the allegations of gross negligence [in the complaint] are practically non-existent," and (2) because "[n]o evidence presented adequately supports the assertion that Sgt. Cooper's actions . . . rose to the level of 'outrageous' or 'utterly indifferent to the rights of others.'" We hold that these rulings were erroneous for the reasons set forth below. But the defendants also argue that, even if the trial court erred in granting judgment notwithstanding the verdict as to the finding of gross negligence on the part of Sgt. Cooper, the finding of gross negligence should nevertheless be vacated because it was the product of certain improperly admitted evidence. Finally, the defendants argue that the federal court's rejection of appellants' federal claims required a ruling by the trial court against the appellants on the gross negligence issue. We reject these last two arguments for the reasons set forth below.

## A. Pleading requirements

On Friday, October 21, 2011, after a two week trial and while arguing its motion for judgment at the close of evidence, the defendants asserted, among other things, that there was not sufficient evidence of gross negligence, but they did not assert that there was a defect in the pleadings. On Monday, October 24, 2011, just before jury instructions were given, the defendants for the first time asserted that the complaint did not sufficiently allege gross negligence on the part of the correctional officers. The court denied both the October 21

25

motion for judgment and the October 24 request to reconsider. But seven months after the trial, the court reversed course in its memorandum opinion and order of June 8, 2012, granting the State's motion for JNOV on the gross negligence issue.

Assuming *arguendo* that the adequacy of the complaint remained open to challenge after the close of evidence at trial, *see* Maryland Rule 2-324(a), we are satisfied that the allegations in the complaint were sufficient to state a claim for damages based upon gross negligence. In *Tavakoli-Nouri v. State*, 139 Md. App. 716, 730-31 (2001), in reviewing the trial court's dismissal of a *pro se* complaint for failure to state a claim, we said:

> [I]t is not essential for the plaintiff to identify the particular "legal name" typically given to the claim he has pled. The critical inquiry is not whether the complaint specifically identifies a recognized theory of recovery, but whether it alleges specific facts that, if true, would justify recovery under any established theory. Essentially, a complaint is sufficient to state a cause of action even if it relates "just the facts" necessary to establish its elements. This is consistent with the "notice" purpose of the modern complaint; "[a] pleading shall contain only such statements of fact as may be necessary to show the pleader's entitlement to relief...." Md. Rule 2–303(b); *see Scott v. Jenkins*, 345 Md. 21, 28, 690 A.2d 1000 (1997).

Here, the record is plain that, even before the complaint was filed, the State was aware that gross negligence would be at issue in this case. The notice of claim sent to the State Treasurer in April 2005 put the State on notice that appellants would be asserting a claim for "acts and omissions that amount to gross negligence[.]" Moreover, a review of the complaint reveals that facts which would constitute gross negligence were sufficiently pled by appellants; the complaint included the following allegations:

26

30. At some time during the transport of inmates from Hagerstown to Baltimore, the deceased was strangled, assaulted, battered and had his throat slashed. This, despite a prolonged struggle, yelling for help, suspicious movements and actions by a number of inmates, and other conduct which should have led to prompt measures being taken to stop the brutal attack and to save the deceased's life. **The failure of the correctional staff to provide timely and proper assistance to the deceased in his helpless condition amounted to *deliberate indifference on the part of all defendants.***

31. Upon information and belief, **one or more of the staff assigned to the transport vehicle were** sleeping, listening to a radio or watching a portable televison, **inattentive and/or unwilling to become involved in stopping the brutal attack upon the defenseless deceased leading to his death.**

* * *

34. Upon information and belief, the officers on the transport vehicle knew, or reasonably should have known, of impending violence in general, and particularly in regard to inmate Johns who had threatened to kill. Despite this knowledge and/or the ability to obtain the knowledge, nothing was done to provide care, safekeeping and protection to the deceased. **The failure to properly supervise and control Johns while transporting him** in a bus full of restrained inmates **constituted both *cruel and unusual punishment and deliberate indifference to the helpless state of the decedent*** and others riding on the said transport vehicle.

35. Upon information and belief, when the said transport vehicle arrived at Supermax and Philip E. Parker was observed by correctional staff and while still living, was removed from the same vehicle by yanking him off of the seat where he was slumped over bleeding, pulled by his legs down the aisle of the bus, and dragged off the bus with his head striking each step and onto the concrete where the bus had stopped.

36. Upon information and belief, once being taken off the said vehicle, the deceased was allowed to lay in place for a period of time before being taken to Supermax at which time his body was allowed to lay on the ground in a holding area for a significant and unreasonable amount of time before any one of a number of officers standing around, began to administer CPR in an attempt to resuscitate and revive the still living

27

Philip E. Parker, Jr., **all of these acts, errors and omissions constituted** *cruel and unusual punishment and deliberate indifference to the helpless state of the decedent* and others riding on the said transport vehicle.

37. That for a substantial period of time prior to the events of February 1 and February 2, 2005 the defendants, the State, Saar, and Sizer, their agents[,] servants and employees acting within the scope of their employment had received numerous and repeated complaints from wardens, supervisory and managerial employees, and subordinates, other administrative personnel, correctional officers, inmates, families of inmates, and other interested person that there was inadequate staff, and resources, improper assignment of staff, improper hiring, training, supervision, improper equipment, including vehicles, and inadequate policies, directives, procedures, as well as the failure to follow written and verbal policies, directives and procedures, all of which created hazardous and unconstitutional conditions, especially with respect to the manner and methods used to transport Supermax inmates, such as Johns. In addition, said defendants had actual and constructive notice and knew, or reasonably should have known, that many of the policies, procedures and directives, including those that are written and disseminated to State correctional employees, from top to bottom, were regularly, habitually and continuously not followed, not expected to be followed, and could not have been followed, given the shortage of personnel and the allocation of staff and resources and the lack of adequate staff and resources and equipment needed to ensure even the most basic safety requirements in a constitutionally sufficient fashion and **the administration as a whole, and thereby the State of Maryland**, *has shown a deliberate indifference to the safety of employees, inmates generally and particularly the deceased*, **especially in the area of transportation of inmates**, and in particular regarding the facts and circumstances, acts, errors and omissions, *which exceed mere negligence or gross negligence,* and which led to and proximately caused and/or contributed to the death of the decedent. All of this *constituted deliberate indifference to the safety of all inmates* assigned for care, safekeeping and protection, by the defendant state and such indifference also has placed correctional staff involved in the day to day operation of the State's prison facilities and more particularly, involved in the transport of inmates from one facility to another at great risk for their safety.

28

42. As a direct and proximate result of the conduct alleged herein, **all of the defendants deprived the decedent of** the following clearly established rights under the Eighth and Fourteenth Amendments of the United States Constitution, more specifically: (a) the right to be free from the use of excessive and unreasonable force and seizure; (b) *the right to be free from the deprivation of life and liberty without due process of law; (c)the right to be free from cruel and unusual punishment; and (d) the right to be free from deliberate indifference to the assault, battery, choking, and slashing of the deceased's throat as well as to the urgent medical needs of the deceased once he had been injured*.

* * *

58. **The actions and conduct of Officers** Robert Scott, Kenyatta Surgeon, **Larry Cooper**, Earl Generette, Charles Gaither and Officers #9 and #10 in forcibly removing the deceased from the transport vehicle as hereinbefore described, the allowing of the decedent to remain without assistance for a period of time, the dragging of the decedent into Supermax and the treatment of the decedent once inside the said facility **constitutes** an assault, battery, and *deliberate indifference to the emergent needs of the decedent*.

(Emphasis added.)

The Court of Appeals, in *Romanesk, supra*, 248 Md. at 423, described gross negligence as occurring when the actor is "so utterly indifferent to the rights of others that he acts as if such rights did not exist" or acts "with a thoughtless disregard of the consequences without the exertion of any effort to avoid them." The complaint's allegations put the defendants on notice that they were being charged with more than mere negligence, and specifically advised the defendants that they were being charged with conduct that was deliberately indifferent to the rights of the decedent. This was enough to assert a claim of gross negligence.

29

Accordingly, it was error for the trial court to have decided, post-trial, that gross negligence was not sufficiently pled.

**B.    The trial court erred in substituting its view of evidence for the jury's.**

As noted above, the question of whether or not gross negligence exists is one for the jury. Here, the jury made a specific finding that defendant Cooper "was grossly negligent toward Philip Parker, Jr." In *Barnes v. Greater Baltimore Medical Center*, 210 Md. App. 457 (2013), a medical malpractice case in which we were examining a trial court's grant of a motion for JNOV, we outlined the parameters for appellate review of such a ruling:

> We review the circuit court's grant of a JNOV motion *de novo*. See *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md.App. 321, 329 (2012). Thus, like the circuit court, we focus on whether the [appellants] presented evidence that, taken in the light most favorable to the nonmoving party, legally supported their claim. *Elste v. ISG Sparrows Point, LLC*, 188 Md.App. 634, 645–46 (2009). The evidence legally supports a claim if any reasonable fact finder could find the existence of the cause of action by a preponderance of the evidence. *Hoffman v. Stamper*, 385 Md. 1, 16 (2005). **In a jury trial, the amount of legally sufficient evidence needed to create a jury question is slight**. *Id*. Thus, **if the nonmoving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the JNOV should be denied**. *Aronson & Co. v. Fetridge*, 181 Md.App. 650, 664 (2008) (Internal quotation marks omitted). In determining the sufficiency of the evidence, the court must resolve all conflicts in favor of the nonmoving party. *Baltimore & O. R. Co. v. Plews*, 262 Md. 442, 449 (1971). Also, the court will assume the truth of all the nonmoving party's evidence and inferences that may naturally and legitimately be deduced from the evidence. *Id*.

*Id*. at 480 (emphasis added).

Here, there was evidence which, if credited by the jury, supported the jury's finding that Sgt. Cooper was grossly negligent. There was evidence that Sgt. Cooper was required,

30

during transport, to maintain "direct observation" of inmates, which is defined as "continuous, unobstructed surveillance." He was seated just a little more than seven feet from where the violent attack on Philip Parker occurred, yet performed his surveillance duties with such indifference and disregard for Parker's safety that Sgt. Cooper failed to take any action to stop the attack and prevent the murder occurring right in front of him. The attack occurred in phases. Initially, Johns stood and hooked his arm around Philip Parker's neck from behind, choking him. Later, when Philip Parker began to make guttural sounds, Johns changed seats in order to continue the attack. Others in the bus saw and heard the attack. Moreover, the State performed a reenactment of the attack in the course of its investigation, and concluded that Johns's movements inside the bus should have been readily observable by a person in Sgt. Cooper's position even with the lights completely off and only a small amount of ambient light from outside.

Yet Sgt. Cooper claimed to have seen nothing unusual on the night in question, not even Johns's change of seats. Sgt. Cooper claimed to have heard nothing unusual. The movement by inmates inside the bus was contrary to policy, and Cpl. Scott even reported Johns's movement to Sgt. Cooper. Cpl. Scott called the front of the bus and asked that the lights be turned on. There was evidence that Cpl. Scott and Sgt. Cooper shined their flashlights in the vicinity of where Johns was sitting, but did not leave their seats to investigate further. Despite the claims of seeing no unusual activity, there was evidence that the officers on the bus were sufficiently concerned that something "unusual" had or was

31

happening that the driver of the bus increased his speed, and the officers formulated a plan to enter the bus as a team upon arrival at Supermax. This was contrary to the usual deboarding procedure, and was an acknowledgment that the "unusual" events that had taken place on the bus indicated potential danger to personal safety. But Sgt. Cooper, as the Officer in Charge, failed to conduct or order any effective investigation of the unusual activity among the inmates on the bus. Sgt. Cooper's own testimony that he did not see what was there to be seen right in front of him — Johns standing and later changing seats in order to strangle and cut Parker, and Parker's futile (and, according to the testimony of Patrick Cook and Johns's own statement, noisy) struggles – could support a rational inference that Sgt. Cooper was "so utterly indifferent to the rights of others [*i.e.*, the inmates in his custody] that he act[ed] as if such rights did not exist." *Romanesk*, *supra*, 248 Md. at 423.

In *Catterton v. Coale*, 84 Md. App. 337 (1990), we held that a motion to dismiss a negligence and malicious prosecution suit against a county social worker should not have been granted because, we observed, the plaintiff's allegation in that case that the social worker had fabricated a report "is sufficient to show malice or gross negligence." *Id*. at 343-44.

In *Newell v. Runnells*, 407 Md. 578 (2009), the Court of Appeals reversed the grant of summary judgment in favor of the State's Attorney for Caroline County, who had been sued after firing two employees who had campaigned for the opposing candidate in the election in which the State's Attorney won his job. The issue for the court was whether the plaintiffs had generated "a triable issue as to whether [the State's Attorney] acted with . . . gross negligence

32

when he fired them, such that he, in his individual capacity, could be held liable under the MTCA." *Id.* at 606. The Court held that summary judgment should not have been granted because the fired employees had "generated a material dispute of fact concerning the issue of possible gross negligence on [the State's Attorney's] part." *Id.* at 638. Finding that "a reasonable trier of fact reasonably could infer that [the State's Attorney's] decision to terminate Plaintiffs reflected a conscious disregard for their rights as employees," and further finding that Plaintiffs "articulated facts tending to show that Newell's decision to fire them was, at worst, a targeted reprisal for speaking against him or, at best, a reckless disregard for their rights to free speech," the Court concluded that summary judgment had been improper. *Id*. at 639.

Similarly, there was adequate evidence for the jury to find gross negligence in the acts and omissions of Sgt. Cooper in the present case. Gross negligence was properly pled and was supported by the evidence. The jury's finding on that factual issue should not have been disturbed by the trial judge.

### C.     The trial court's evidentiary rulings were not erroneous and do not require a new trial on the gross negligence of Sgt. Cooper.

The defendants argue that, even if the trial court erred in granting judgment notwithstanding the verdict as to the finding of gross negligence on the part of Sgt. Cooper, the finding of gross negligence should be vacated because it was the product of certain improperly admitted evidence. Specifically, the defendants argue that the trial court committed reversible in  admitting into evidence redacted versions of (1) "Administrative

33

Charging Documents," and (2) an "out of court statement of Kevin Johns." We find no error in the admission of this evidence.

The defendants fail to identify by exhibit number the "Administrative Charging documents" to which they object. In context, however, the defendants appear to be referring to the "Notices of Termination" issued to several correctional officers by the State and signed by Secretary Saar. The only objections made at trial when these Notices of Termination were offered were that the documents constituted inadmissible hearsay and were unduly prejudicial. We hold that the Notices of Termination that were signed by Secretary Saar were properly admitted against the State pursuant to Maryland Rule 5-803(a) as statements of a party opponent.

Rule 5-803(a) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (a) Statement by party-opponent. A statement that is offered against a party and is:
>
> (1) The party's own statement, in either an individual or representative capacity;
>
> (2) A statement of which the party has manifested an adoption or belief in its truth;
>
> (3) A statement by a person authorized by the party to make a statement concerning the subject; [or]
>
> (4) A statement by the party's agent or employee made during the agency or employment relationship concerning a matter within the scope of the agency or employment . . . .

34

*See, e.g., Crane v. Dunn,* 382 Md. 83, 96 (2004) ("'Admissions, in the form of words or acts of a party-opponent, may be offered as evidence against that party.'") (quoting *Briggerman v. Albert,* 322 Md. 133 (1991)); *B & K Rentals & Sales Co. v. Universal Leaf Tobacco Co.,* 324 Md. 147, 157-58 (1991) ("Statements by agents concerning a matter within the scope of the agent's employment and made during the existence of the agency relationship should be admissible without the necessity of proving that the agent had authority to speak or that the statements were part of the *res gestae*." (Citing Federal Rule of Evidence 801(d)(2)(D)).

The "Notices of Termination" reflected the results of the State's investigation and were the State's official position on the conduct of its employees during the incident. These Notices of Termination stated on their face that they were issued "[u]nder the authority of Title 11 of the State Personnel and Pensions Article," and were signed and "approved by" Secretary Saar. The State was and is a party to the action, as was Secretary Saar. These documents contained "statements of a party opponent."

The State, however, contends that the documents did not contain "admissions" of the State and Secretary Saar because the documents included charges of recklessness, intentional misconduct, and gross negligence on the part of correctional officers, and because neither the State, nor Secretary Saar, could ever be liable for such conduct under the MTCA.

The short answer to this contention is that Rule 5-803(a) provides for the introduction in evidence of "statements" of a party opponent and the party's agents, and is not limited to statements which constitute an admission by the party. Professor Lynn McLain explains in her

35

treatise on Maryland evidence that the statement of a party opponent need not be an admission against interest:

> The term "admission" is misleading, in that it suggests that an out-of-court statement must have been against the party-opponent's interest at the time it was made in order for it to qualify under the hearsay exception. This suggestion is compounded by frequent confusing references to this hearsay exception as involving "admissions against interest." To the contrary, in order for a statement to qualify under the party-opponent hearsay exception, there is no requirement that the out-of-court statement have been against the party's interest at the time it was made; it may even have been self-serving then.

LYNN MCLAIN, 6A MARYLAND EVIDENCE § 801(4):1 at 332 (3d ed. 2013) (footnotes omitted).

Moreover, the documents *did* contain numerous admissions which supported the claim against the State. The Notices of Termination contained admissions as to a number of duties owed by the State and its employees to the decedent. For example, the Notice of Termination issued to Sgt. Cooper admitted that, "[p]rior to seating the inmates on the bus, the CTU officers were responsible for securing the inmates in a three-piece restraint device that consists of handcuffs, leg irons and a waist restraint chain, secured by a metal box and a padlock." In the Notice of Termination, the State admitted that the Officer in Charge, Sgt. Cooper, "was responsible for supervising the transportation detail." The Notice of Termination admitted that the correctional officers, including Sgt. Cooper, had a duty to be "familiar with the directives pertaining to the transportation bus" and a duty to be "alert and attentive at all times during their tour of duty." The Notices of Termination contained admissions by the State that the officers, including Sgt. Cooper, breached duties owed to the

36

decedent. For example, the Notice of Termination issued to Sgt. Cooper stated that, "as the Officer-in-Charge, Mr. Cooper had a duty to take the appropriate steps necessary to prevent inmate Johns' murder of inmate Parker. The investigation revealed that he failed to issue any orders to subordinate staff or to the inmate in custody." The Notice of Termination issued to Sgt. Cooper also stated: "After reviewing the investigative findings, it was determined that Mr. Cooper violated several Post Orders, Institutional Directives and Department of Public Safety & Correctional Services' policies and procedures." The admission of these documents was not error.

The defendants also include a single sentence in a footnote in their brief critical of the admission in evidence of Exhibits 43 and 44. The footnote states: "Similarly, the memoranda on which Secretary Saar based her decision to approve the termination, admitted as Plaintiffs' Ex. 43 and 44, were, as defense counsel observed, riddled with prejudicial and inadmissible hearsay." The defendants, however, did not provide any further argument regarding Exhibits 43 and 44, and did not include the referenced exhibits in their Appendix. It appears that Exhibit 43 was a memorandum prepared by the Department proposing termination of Cpl. Scott, and Exhibit 44 was a similar memorandum proposing termination of Sgt. Cooper. In the absence of any argument from the defendants as to why these documents should be treated differently from the Notices of Termination discussed above, we decline to address this argument further. *Shell Oil Co. v. Ryckman,* 43 Md. App. 1, 4 (1979).

Finally, the defendants assert that the trial court erred in admitting into evidence the transcribed statement that Johns gave to a State investigator three days after the murder. The defendants' objection to the statement at trial was as follows:

> So our general objection to the confession would be that Mr. Johns wasn't competent to testify or help himself or anything like that on February 1ˢᵗ. So we're not sure – we have no idea what his state of mind was [on the date of the statement], but we don't think he would have been a competent witness. So we think that's one basis for excluding a confession.
>
> And then I guess just to post generally of course we have no ability to cross-examine Mr. Johns when he was talking to the IIU investigator with regard to this. And we just found out recently that this transcript was available. . . .
>
> So if this court were actually – is going to hold that the confession is admissible, there are parts that we think are, excerpts not admissible, like where he gives statements where he doesn't – where he makes conjecture and he says things that are not based in fact. So I would – like he says, he says, for example, Officer Scott had to have seen what happened. Well, he doesn't know whether Officer Scott should – you know, could have seen or not. I don't think that's admissible at all and I would ask that be stricken.
>
> We haven't had time to go through it line by line, but if this court were to say it were admissible despite our objection, there's some parts unfortunately we would really like to keep out of the jury's view.

Although the defendants now claim that the transcribed statement was inadmissible hearsay, the word "hearsay" does not appear anywhere in the defendants' objection at trial. Generally, Maryland litigants are not required to state the specific ground for an objection unless requested to do so by the trial court. Maryland Rule 2-517. But, if counsel argues specific grounds for an objection, the litigant may raise on appeal only those grounds actually presented to the trial court. All other grounds for the objection, including those appearing for

38

the first time in a party's appellate brief, are waived. *See, e.g., United States Gypsum Co. v. Baltimore*, 336 Md. 145, 173-75(1994). Because no hearsay objection was argued at trial, none will be entertained on this appeal.[6]

**D.** **The federal court's rejection of the federal claims did not require a ruling against appellants on the gross negligence issue.**

The defendants argue that, "in light of the federal district court's ruling that Sgt. Cooper's conduct was merely negligent, the circuit court's ruling [granting judgment notwithstanding the verdict as to Sgt. Cooper's gross negligence] was required [in order] to prevent legally — and factually — inconsistent final judgments in the same case." This argument assumes that the federal court considered and rejected a claim of gross negligence under Maryland State law. That was not the case. Appellants' federal claim was brought under 42 U.S.C. § 1983 for an alleged violation of the decedent's rights under the 8th Amendment of the U.S. Constitution. The opinion of the federal court dealt with the legal question of whether the officers were "deliberately indifferent" to the decedent's rights to a degree that would support the federal claim. The Fourth Circuit held that this standard requires a plaintiff to show that the officer "knows of and disregards an excessive risk to inmate health and safety" and this standard "sets a particularly high bar to recovery." While the "deliberate indifference" standard under federal law may have similarities to the "gross

---

[6]Moreover, although the defendants complain in their brief that "Mr. Johns's statements about the officers' ability to see him assault the victim or hear the victim make sounds did not qualify as a declaration against interest," and therefore should not satisfy an exception to the hearsay rule, they fail to acknowledge that the trial court actually redacted these very statements from the transcribed confession before submitting it to the jury.

39

negligence" standard under state law, they are not fungible. Indeed, the federal court specifically abstained from deciding any State law issue and remanded all of those issues, including the issue of gross negligence, to the State courts. The ruling of the federal court on the federal claim was not dispositive of State claims based upon gross negligence.

## II. Immunities

Our holding that the trial court erred in striking the jury's finding of gross negligence on the part of Sgt. Cooper requires us to examine the implications of that finding with respect to the liability of the various defendants and the application of any immunities. The defendants argue that the trial court correctly found that Sgt. Cooper was shielded from liability by common law public official immunity and by immunity under the MTCA. Appellants respond that public official immunity, regardless of its source, is destroyed in the presence of gross negligence and/or a special relationship, both of which exist here. We will address and examine each potential source of immunity. Because we conclude that Sgt. Cooper is not entitled to protection of immunity under either the MTCA or common law public official immunity, we will then address the impact of that loss of immunity on the judgments in this case.

### A. Immunity under the MTCA

Because the jury's finding that Sgt. Cooper acted with gross negligence must be reinstated, Sgt. Cooper is not eligible for immunity under the MTCA, and the State retains its sovereign immunity with respect to the claims against Sgt. Cooper. The MTCA is codified at

Maryland Code (1984, 2009 Repl. Vol.), State Government Article ("SG"), § 12-101 *et seq*.

Section 12-104 provides, in pertinent part:

(a)    (1)    Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.

        (2)    The liability of the State and its units may not exceed $200,000 to a single claimant for injuries arising from a single incident or occurrence.

(b)    Immunity is not waived under this section as described under § 5-522(a) of the Courts and Judicial Proceedings Article.  ...

Section 5-522 of the Courts and Judicial Proceedings Article — referenced in SG § 12-104(b) — provides, in pertinent part that, when State personnel commit a tortious act or omission with gross negligence, then (a) the sovereign immunity of the State is not waived, and (b) there is no statutory immunity under the MTCA for the State personnel who committed the act or omission. Section 5-522 provides:

(a)    **Immunity of the State is not waived** under § 12-104 of the State Government Article for:

    (1)    Punitive damages;
    (2)    Interest before judgment;
    (3)    A claim that arises from the combatant activities of the State Militia during a state of emergency;
    (4)    **Any tortious act or omission of State personnel that**:
        (i)    Is not within the scope of the public duties of the State personnel; or
        (ii)    **Is made with** malice or **gross negligence**;
    (5)    A claim by an individual arising from a single incident or occurrence that exceeds $200,000; or

41

(6)     A cause of action that law specifically prohibits.

(b)     State personnel, as defined in § 12-101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made **without malice or gross negligence**, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver. . . .

(Emphasis added.)

When we read SG § 12-104 and CJP § 5-522 together, it is clear that State personnel are immunized for their tortious conduct committed within the scope of their public duties, unless that conduct was, as in the case of Sgt. Cooper, committed "with malice or gross negligence[.]" CJP § 5-522(a)(4)(ii). The jury's finding that Sgt. Cooper acted with gross negligence defeats his claim to immunity for State personnel under the MTCA.

**B.     Common law public official immunity**

Common law public official immunity applies when (1) the actor is a public official, and (2) the complained-of conduct occurred in the course of the actor's performance of discretionary — as opposed to ministerial — acts, which were (3) within the scope of the actor's official duties. *Houghton v. Forrest*, 412 Md. 578, 585 (2010). Prison guards are considered public officials. *Carder v. Steiner*, 225 Md. 271, 275 (1961). *See also Livesay v. Baltimore County*, 384 Md. 1, 14 (2004) (explaining that *James v. Prince George's County*, 288 Md. 315, 323 n.9 (1980), "did not purport to overrule *Carder's* specific holding that a prison guard was a public official in the context of public official immunity"). Ministerial

42

duties are those to which nothing is left to the official's discretion, while discretionary acts are those involving "the freedom and authority to make decisions and choices*." State ex. rel. Clark v. Ferling*, 220 Md. 109, 113 (1959). No dispute has been raised in this case as to whether Sgt. Cooper's actions were discretionary or ministerial. Like the police officer who was deemed a public official in *Houghton, supra*, 412 Md. at 585, Sgt. Cooper also was empowered with the discretionary "'freedom to act according to one's judgment in the absence of a hard and fast rule.'" (Quoting *Schneider v. Hawkins*, 179 Md. 21, 25 (1940)). Sgt. Cooper fell within the class of employees who might enjoy common law public official immunity based on being a public official, engaged in the performance of discretionary acts, within the scope of his employment. *Id*.

Common law public official immunity does not protect a defendant against personal liability in cases where the official committed an intentional tort, *Houghton, supra* at 586, or acted with malice, *Robinson v. Board of County Comm'rs for Prince George's County*, 262 Md 342, 348 (1971) ("Indeed we can not think of any reason why a public official should not be held responsible for his malicious actions even though he claims they were done within the scope of his discretionary authority."). But, in this case, there was no finding of actual malice; nor was there a finding of liability in connection with any intentional tort. These two disqualifications for common law public official immunity therefore do not apply to the case at hand.

43

In the briefs in this case, the parties disagree about the impact the jury's finding of gross negligence has upon the applicability of common law public official immunity. The appellants insist that either gross negligence or (as we shall discuss later) a special relationship defeats common law public official immunity. The defendants argue that only malice provides an exception to common law public official immunity. In support of the defendants' position, they cite *McCoy v. Hatmaker*, 135 Md. App. 693 (2000); *Lee v. Cline*, 384 Md. 245 (2004); *Livesay v. Baltimore County*, 384 Md. 1 (2004); and *D'Aoust v. Diamond*, 424 Md. 549 (2012).

In *McCoy*, the widow of a man who died suddenly in his car sued Hatmaker, a Baltimore City paramedic, and Schwaab, a Baltimore City police officer, alleging that neither man — both trained first responders — complied with the relevant standard of care when each assessed the decedent as beyond resuscitative help. The widow asserted that Hatmaker and Schwaab acted with gross negligence. Hatmaker and Schwaab raised the Good Samaritan Act and the Fire and Rescue Company Act as defenses, and argued that, because they did not act with gross negligence, they were immune from suit under both statutes. The trial court agreed, and granted summary judgment in their favor. On appeal, we affirmed because the appellant could not point to any facts showing "a deliberate choice not to give McCoy a chance to survive." In affirming, we also noted:

> **Even if appellant could have proven gross negligence, Officer Schwaab, as a law enforcement official, also qualifies for public official immunity** under the rule of *DiPino v. Davis*, 354 Md. 18, 48-49, 729 A.2d 354 (1999). Such immunity is hard to defeat. Under the rule of *DiPino*, the court must find that

two factors exist simultaneously before it can relieve a governmental official of liability for his negligent acts. First, the actor whose conduct is at issue must be a public official rather than a mere government employee or agent. Second, the tortious conduct must have occurred while he was performing discretionary rather than ministerial acts in furtherance of his official duties. If the official can establish those two factors, he receives qualified immunity, that is, immunity *in the absence of malice*.

135 Md. App. at 719 (emphasis added). Accordingly, there is *dicta* (but not a holding) in *McCoy* indicating that public official immunity would have been applicable "[e]ven if the appellant could have proven gross negligence." *Id.*

In *Lee v. Cline*, 384 Md. 245 (2004), a case interpreting the MTCA, the Court of Appeals discussed common law public official immunity only tangentially. The passing reference to gross negligence in *Lee* appears in the context of a discussion of immunity under the MTCA. *Id.* at 261 ("[T]he purpose of the [Maryland] Tort Claims Act's immunity is to insulate state employees generally from tort liability if their actions are within the scope of employment and without malice **or gross negligence**." (emphasis added)).

*Livesay v. Baltimore County*, 384 Md. 1 (2004), was a Local Government Tort Claims Act (LGTCA) case in which a Baltimore County correctional officer — Officer Fore — was sued for his failure to render direct assistance to an inmate who had attempted suicide. The correctional officer described himself as being "in shock" upon finding the inmate "sitting slumped on the floor of his cell, a bed sheet tied between his neck and the bunk bed." Officer Fore called the jail's Emergency Response Team, but made no other effort to provide care to the inmate while waiting for the team to arrive. By the time the team arrived, the inmate

45

suffered hypoxic brain damage. The inmate subsequently filed a negligence action against Officer Fore, the correctional officer who initially discovered the attempted suicide. The circuit court granted summary judgment to Officer Fore on the basis of common law and statutory public official immunity. Among Livesay's contentions on appeal was his argument that a county employee is not a "municipal" employee, a notion the Court of Appeals rejected. In affirming the circuit court's finding that Officer Fore was entitled to statutory public official immunity "so long as he is acting in a discretionary capacity, without malice, and within the scope of his employment or authority," the Court also noted that LGTCA expressly preserved, in CJP § 5-503(d), "any common law or statutory defense or immunity in existence as of June 30, 1987." The Court further discussed public official immunity at common law as follows:

> We have held that the purpose of [CJP] § 5-507(b)(1) "was to codify existing public official immunity, and not to extend the scope of qualified immunity beyond its Maryland common law boundaries." *Lovelace v. Anderson*, 366 Md. 690, 704, 785 A.2d 726, 734 (2001) (quoting *Ashton v. Brown*, 339 Md. 70, 116 n. 23, 660 A.2d 447, 470 n. 23 (1995)). As discussed *infra*, officials of Maryland counties enjoy common law public official immunity. Section 5-507(b)(1) codified the common law, and while it did not extend the scope of the common law, it did not limit it either. Under the common law, county public officials enjoyed immunity; accordingly, despite the seemingly narrower drafting, § 5-507(b)(1) applies to county as well as municipal officials. As appellees point out, a contrary holding would produce the absurd result that when city and county police respond to the same emergency, the former enjoy immunity but the latter do not. We do not believe the Legislature intended this result.

> Because we hold that § 5-507(b)(1) merely codified Maryland common law public official immunity, and because the case law on common law public official immunity is more developed, we shall analyze Fore's situation in that

context. **A governmental representative is entitled to public official immunity under the common law when he or she is acting as a public official, when the tortious conduct occurred while that person was performing discretionary rather than ministerial acts, and when the representative acted without malice**. See *Lovelace v. Anderson*, 366 Md. 690, 714, 785 A.2d 726, 739 (2001) (citing *James v. Prince George's County*, 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980)); *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 137, 753 A.2d 41, 61 (2000).

*Id.* at 12 (emphasis added).

On its face, the statement in *Livesay* indicating that a government representative is entitled to common law public official immunity if the representative acted "without malice" seems to imply that only malice can defeat such immunity. But the *Livesay* Court expressly avoided reaching such a conclusion, stating, *id*. at 18:

Livesay, for the first time [on appeal], contends that Fore established a "special relationship" with him, and that under our holdings in *Williams* [359 Md. 101 (2000),] and *Ashburn* [306 Md. 617 (1988)], this defeats Fore's claim of immunity. Livesay also contends for the first time that Fore acted with "deliberate indifference" when he failed to render direct aid.

Because these issues were not raised below, we shall not consider them.

*D'Aoust v. Diamond*, 424 Md. 549 (2012)*,* dealt with a foreclosure sale in which the property owner claimed that the court-appointed trustees failed to send proper notice to her at her last known address, and then lied about having accomplished service in an affidavit filed with the court. For that reason, the property owner argued, the trustees were not "public officials" entitled to public official immunity. Both the trial court and this Court ruled that the trustees were protected by qualified judicial immunity. But the Court of Appeals sided with the property owner, and held that the trustees enjoyed neither qualified judicial immunity

47

nor common law public official immunity. The Court of Appeals noted that it had never recognized a "qualified judicial immunity." 424 Md. at 585. Moreover, the Court held that, because the trustees "were clearly not public officials," it was plain that "the concept of qualified public official immunity is inapplicable to their actions in connection with the judicial sale of [the property owner's] condominium." *Id*. at 592. Consequently, *D'Aoust* offers no guidance on the question of whether public official immunity protects Sgt. Cooper from personal liability in the present case.

In the cases above, the Court described common law public official immunity as being available to a governmental representative when he or she is acting as a public official if the tortious conduct occurs while performing discretionary rather than ministerial acts and the representative acts without malice. But none of these cases specifically holds that a finding of malice is the only way to defeat common law public official immunity.

Appellants cite two cases which they argue constitute "contrary and more recent authority" in support of their contention that gross negligence defeats common law public official immunity: *Hines v. French*, 157 Md. App. 536 (2004), and *Lovelace v. Anderson,* 366 Md. 690 (2001). But our examination of these cases does not persuade us that either case provides compelling support for appellants' argument.

*Hines* involved an appeal from a grant of summary judgment in favor of a deputy sheriff who allegedly attacked the plaintiff during a traffic stop and, without provocation, forced her face into the side of her vehicle despite having noticed that she had recent TMJ

48

surgery. In reversing the summary judgment in favor of the deputy sheriff, we held: "Assuming a jury found these allegations to be true, [the deputy's] conduct would constitute *malice*, and thus, qualified immunity would not be available to him as a defense." *Id.* at 564 (emphasis added).

In *Hines,* we explained that, when a claim is made under the MTCA, State personnel are immune, pursuant to CJP § 5-522(b), from liability in tort for an "*'act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence . . . .'" Id.* at 562 (quoting CJP § 5-522(b)) (italics in quoted opinion). We then stated: "Accordingly, whether under common law qualified immunity or the statutory qualified immunity provided by the MTCA, [the defendants] may only avoid liability for a claim of negligence if their conduct was within the scope of the duties of State personnel and each acted without malice or gross negligence." *Id.* at 562. To the extent that the quoted language from *Hines* suggested that gross negligence might also defeat common law public official immunity (as it does MTCA statutory immunity), such statement was clearly *dicta* because there was no claim of gross negligence in that case. *Hines* did not hold that the gross negligence of a defendant defeats public official immunity.

*Lovelace* involved an appeal from a grant of summary judgment on grounds of public official immunity in favor of a hotel security guard and his employer. The privately-employed security guard — who was an off-duty police officer — shot and injured a hotel guest while engaged in a gun battle with two armed robbers in the hotel lobby. *Lovelace* held that the

49

security guard would not be entitled to public official immunity if a finder of fact concluded that he was acting as a private security guard for the hotel rather than as a public official. Consequently, the circuit court should not have granted summary judgment on the basis of immunity. Although the *Lovelace* Court cited other cases for the proposition that common law public official immunity may not apply under circumstances where there is a special relationship between a police officer and a victim, *id*. at 706-07, the Court did not hold that proof of gross negligence would defeat common law public official immunity if the official could otherwise qualify for such immunity.

We conclude that existing case law does not definitively answer the question of whether gross negligence defeats common law public official immunity. Appellants nonetheless insist that this Court should recognize such a rule (a) because, "when the legislature codified public official immunity [in the MTCA], it specifically included gross negligence as an exception," and (b) because "the interplay between the MTCA and Article 19 of the Maryland Declaration of Rights mandates adoption of the gross negligence standard for piercing public official immunity."

We find it unnecessary to resolve the dispute between the parties as to whether common law public official immunity can be defeated by proof of gross negligence; there is an alternative ground for invalidating Sgt. Cooper's claim of common law public official immunity. The Court of Appeals has stated: "In the presence of a 'special relationship,'

50

liability may lie, and [public official] immunity may not survive." *Williams v. Mayor &*
*Council*, 359 Md. 101, 144 (2000).

Here, there was clearly a special relationship between Sgt. Cooper and the decedent,
Philip Parker, Jr., and also a special relationship between Sgt. Cooper and the murderer, Kevin
Johns. To the extent the trial court found otherwise, such ruling was clear error. Indeed, the
defendants, on appeal, do not contest the existence of a special relationship between Sgt.
Cooper and the inmates under his charge. Rather, they disagree about the impact such a
relationship has upon the availability of common law public official immunity under
Maryland law. Defendants argue that, whether a special relationship exists is a factor which
has bearing on only the issue of whether a public official owes a duty to the plaintiff, and is
not a factor which has any impact in determining whether the official is entitled to immunity
if such a duty is breached. However, this position is at odds with *Williams*, in which the Court
of Appeals held that a public official's breach of a duty arising out of a special relationship
not only gives rise to liability but also defeats a claim of common law public official
immunity.

*Williams* involved a negligence suit against a police officer arising out of a domestic
violence incident. There was no claim that the officer either acted with malice or committed
gross negligence, but, viewed in a light most favorable to the plaintiffs, the facts supported
a finding of a special relationship between the defendant police officer and the plaintiffs. The
police officer responded to the home of a domestic violence victim who had been beaten by

51

her abuser. While the victim was giving a statement to the police officer, her abuser called her. After hanging up the phone, the victim told her mother, in the police officer's presence, that her abuser had threatened to return to the home. A short while later, the abuser phoned the home again, and this time the victim's mother answered. The mother expressed her anger at the abuser, and hung up the phone. The police officer took statements from the victim and her mother.

According to the mother, the officer told her "that he had to write his report, and that she was to go in the house, because he was going to remain outside." *Id*. at 150. Unfortunately, the police officer grew impatient waiting for someone to bring him a camera to photograph the daughter's injuries, and, without telling the mother or daughter he was leaving, the police officer decided to drive to the police station to get a camera. Before he returned with a camera, the abuser returned. The abuser shot and killed the daughter, and also shot the mother, who survived but was partially paralyzed. *Id*. at 107.

Suit was subsequently filed against the police officer, alleging that a special relationship had arisen between him and the two women as a result of his actions and express promise of protection. The plaintiffs alleged that this special relationship imposed a duty on the police officer beyond that which would ordinarily be owed generally to citizens threatened by crime. The circuit court granted summary judgment in favor of the police officer based on the court's finding that, as a matter of law, the police officer "was acting in a discretionary capacity, without malice, at the time of the incident and was therefore entitled to qualified

immunity." *Id.* at 112. Although this Court affirmed the grant of summary judgment in favor of the police officer, the Court of Appeals reversed, relying on the "the special relationship exception" to qualified immunity. *Id.* at 130-31. The Court held that the police officer's "affirmative actions, directions and specific promises of protection . . . if they occurred and were reasonably relied upon by [the plaintiffs], may have created a special relationship between [the officer] and [the plaintiffs] that would establish a duty of care on the part of [the officer] to protect them; therefore his actions at [the home of the plaintiffs] might not be protected by either statutory or common law immunity."*Id.* at 112-13. The *Williams* Court reiterated this holding in its "Conclusion" section of the opinion, *id*. at 151, stating:

> [W]e hold that [the police officer's] affirmative actions and specific promises of protection to [the mother and daughter], if in fact they occurred, are sufficient to have created a special relationship between himself and [the mother and daughter]. This special relationship, if it existed, may have created a duty of protection on the part of [the police officer]. If so, his actions at [the victims' residence] may not warrant protection under either statutory or common law immunity.

Although *Williams* appears to be the only case in which the Court of Appeals has expressly held that common law public official immunity may be defeated by proof of a special relationship, similar language appears in *Lovelace v. Anderson,* 366 Md. 690 (2001). In *Lovelace*, the Court of Appeals stated: "Another limitation to a police officer's defense of public official immunity occurs when, under the circumstances, a special relationship exists between the officer and the injured person which creates a duty on the part of the officer to

53

protect the victim." *Id.* at 706 (citing *Williams, supra*, 359 Md. at 143-45). The appellees fail to discuss — or even cite — *Williams* and *Lovelace* in their briefs.

There was clearly a special relationship between Sgt. Cooper and the decedent — and between Sgt. Cooper and Kevin Johns —  that imposed a duty on Sgt. Cooper to protect the decedent from Johns. In *Ashburn v. Anne Arundel County*, 306 Md. 617, 630 n.2 (1986), the Court of Appeals explained that a special relationship exists where there is an ongoing custodial relationship:

> We also note that under § 315(a) of the Restatement (Second) of Torts a duty would be imposed upon an officer to prevent physical harm caused by another to a third person where a special relationship exists between the police officer and the actor. Such **special relationships have been found as to**: parent and child, master and servant, landowner and licensee, **those in charge of persons with known dangerous propensities, and those who have custody of others.** See *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985); Restatement (Second) of Torts §§ 316 to 320. **In order for such a relationship to be found between police and perpetrator, it must be alleged that there was some type of ongoing custodial relationship between the police officer and the actor.** *Lamb v. Hopkins, supra*; see *Jackson v. Clements*, 146 Cal.App.3d 983, 194 Cal.Rptr. 553, 555 (1983). Such was not the case sub judice.

(Emphasis added.)

In *Lamb v. Hopkins*, 303 Md. 236 (1985), the Court of Appeals "expressly adopt[ed] § 319 [of the RESTATEMENT (SECOND) OF TORTS] as the law of this State governing the duty of those in charge of persons having dangerous propensities." *Id*. at 245. *Accord Remsburg v. Montgomery*, 376 Md. 568, 591 (2003). Section 319, captioned "Duty of Those in Charge of Person Having Dangerous Propensities," provides:

54

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

The Comments to § 319 are illuminating. Comment a states:

> a. The rule stated in this Section applies to two situations. The first situation is one in which the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. The second situation is one in which the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

Johns, a Supermax inmate, and a two-time murderer, was within "the class of persons to whom the tendency to act injuriously is normal." And there can be no doubt that the correctional officers transporting Johns back to Supermax had knowledge of Johns's potentially injurious tendencies. Sgt. Cooper, in particular, was an experienced corrections officer who was the Officer in Charge of the transportation detail. Managing the behavior of individuals like Johns is a component of a corrections officer's job.[7]

---

[7]In the Notice of Termination issued to Sgt. Cooper, which came into evidence as Plaintiff's Exhibit 23, the then-Secretary of Department of Public Safety and Correctional Services wrote that the "primary duty" of the officers on the bus was "to maintain custody, security and control of inmates under their supervision." The internal investigation revealed, in the words of the Notice of Termination, that "Mr. Cooper was grossly negligent in the performance of his duties"; that "[Cooper's] failure to conform his behavior within acceptable standards amounts to insubordination and a reckless disregard of institutional policies and procedures"; and that Cooper's "performance lapses breached the safety and security of inmate Parker and contributed to his death." The Department took action to terminate Cooper's employment on the basis of its finding that he had acted in a grossly negligent manner during and immediately after this incident.

Similarly, the special relationship that imposes a duty upon correctional officers to protect persons in their custody from harm is recognized in § 320 of the Restatement (Second) of Torts, which states:

One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor

(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and

(b) knows or should know of the necessity and opportunity for exercising such control.

Comment c to § 320 indicates that the duty is applicable when a jailer has custody of a prisoner who is unable to protect himself from "notoriously dangerous" persons, "as where a prisoner is put in a cell with a man of known violent temper."

In its resolution of the post-trial motions at issue here, the trial court concluded that no special relationship existed, citing *Clark v. Ferling, supra*, 220 Md. 109, as "precedential" and factually "analogous" to the instant case. In *Clark*, the parents of a juvenile inmate of the Maryland Reformatory sued Ferling (who was the superintendent of that institution) after their son was beaten to death in prison by other inmates. In the suit, the parents alleged that their son had testified against certain inmates; that the inmates bore the Clarks' son "great hatred and animosity" and "were determined to seek revenge against him at the first opportunity";

56

and that Ferling had permitted their son to be housed in the same dormitory with the inmates, which led, the parents alleged, to his fatal beating. Their case was dismissed by the circuit court on demurrer, and the plaintiffs appealed. The Court of Appeals affirmed the dismissal, explaining:

> [T]he declaration here has no allegation of malice or evil design on the part of defendant, and further it contains no flat or direct statement that he knew there were "vicious, brutal and homicidal inmates" confined in the dormitory to which the deceased was assigned, that the deceased had testified against anyone causing his conviction, or that anyone had hatred or animosity toward the deceased. Therefore, all that we need to hold in order to decide this case, and all that we do hold, is that the defendant's duties in safely confining the deceased were public in character . . . ; and that he is not liable for injuries inflicted by one of his prisoners upon another, at least, **in the absence of an allegation** of malice or evil purpose on his part, **that he knew of some unusual danger to the party injured**, or that he participated in inflicting the injury. *Cf. St. Julian v. State*, La.App., 1957, 98 So.2d 284.

(Emphasis added.)

Accordingly, the holding in *Clark* is easily distinguished from the present case by the lack of knowledge on the part of the superintendent in that case and his absence from the scene of the inmates' assault. *Clark* does not support the trial court's erroneous conclusion that there was no special relationship between Sgt. Cooper and the inmates involved in the present case.

Because a special relationship existed between the inmates and Sgt. Cooper, and because that relationship gave rise to a duty which was clearly breached, the trial court erred in finding that Sgt. Cooper was entitled to the benefit of common law public official immunity. *Williams, supra*, 359 Md. at 112-13, 151.

57

**III. Should the State be held liable for the full uncapped amount of the verdict?**

Appellants argue that our conclusion that Sgt. Cooper was not entitled to immunity under either the MTCA or common law public official immunity compels restoration of the jury's full award of damages against Sgt. Cooper. We agree, subject however, to any rights of remittitur that may remain unaddressed by the trial court.[8]

Without citation to authority, the appellants also argue "that the State is required to indemnify Larry Cooper in order to avoid a conflict of interest in the Office of the Attorney General because the same member of that office represented both the officer and the State at Trial." The appellants' argument is that the "interests of the State and the individual Defendants are irreconcilable as to the issue of malice/gross negligence and in connection with the post trial motions" and that this divergence in interests gives rise to an "unwaivable conflict of interest under Maryland Rule 1.7." The only remedy to address this conflict of interest, the appellants assert, is to require the State to fully indemnify Sgt. Cooper.

---

[8]On the basis of the record before us, we cannot determine the amount of the verdict that should be eventually entered against Sgt. Cooper on remand. We hold only that Sgt. Cooper is not entitled to the protections of the MTCA or common law public official immunity. Because the trial court erred in striking the finding of gross negligence, the trial court did not address other potential grounds for remittitur. For example, there is a statute potentially applicable to this case which would cap the non-economic damage award. CJP §11-108 imposes caps on awards of non-economic damages in personal injury cases generally. We previously noted that, although the docket entries reflect that two motions for remittitur were filed by the State on November 1, 2011, neither is present in the record or appendix for our review. We do not know for certain the grounds covered in either motion for remittitur, but the appellants' opening brief states that "the Office of the Attorney General filed [post trial] motions seeking to reduce the State's liability to $200,000 and Defendant Cooper's liability to the much higher limit under Section 11-108 of the Courts and Judicial Proceedings Article."

58

The State responds: (1) "there was no conflict of interest because counsel for the State admitted that there was negligence and that the State was therefore liable up to the $200,000 which the State has already paid"; (2) "if there were a conflict of interest, that would be for Sgt. Cooper to raise, not the plaintiffs"; (3) "if the plaintiffs could raise the issue, it would not be in an appeal from the verdict below, but in a separate proceeding to enforce the judgment"; and (4) "the law is clear that the State's agreement to represent a State officer or employee never includes an obligation to indemnify."

These arguments are not ripe for appellate review because it does not appear to us that they were raised in the circuit court. There is no ruling of the circuit court addressing these issues, and we decline to consider such potential issues further. Maryland Rule 8-131(a).

## IV.    Constitutionality of the MTCA's "cap" on damages

The appellants ask us to consider the constitutionality of the MTCA's "cap" on damages, arguing that it violates Article 19 of the Maryland Declaration of Rights, the constitutional mandate of separation of powers, the constitutional right to trial by jury, and the constitutional right to equal protection of the law. The State responds that the MTCA's restriction on recovery is actually a limit of the State's waiver of sovereign immunity, not a legislative "cap" on damages. In *Proctor v. Washington Metro Transit Authority,* 412 Md. 691, 723 (2010), the Court of Appeals explained that, although the MTCA's limit functions like a cap, "it is more accurately described as a limit on the State's waiver of sovereign immunity." The Court stated unequivocally: "[T]he limit on damages contained in §12-104(a)

59

of the State Government Article is a term of the State's waiver of sovereign immunity, not a cap on damages." *Id.* at 722-23. We agree with the State that only the General Assembly can expand that waiver. *Jenofsky v. State Rds. Comm'n,* 264 Md. 471, 474 (1972).

Moreover, in *Gooslin v. State,* 132 Md. App. 290 (2000), *cert. denied,* 359 Md. 334 (2000), this Court previously considered and rejected two of the four arguments advanced by the appellants, namely, that the MTCA's limited waiver of sovereign immunity violates Article 19 of the Maryland Declaration of Rights, 132 Md. App. at 296, and violates the constitutional right to equal protection, *id*. at 298. We decline to reconsider our decision in *Gooslin.*

We also reject appellants' remaining two arguments, namely (1) that the MTCA's limited waiver of sovereign immunity violates the constitutional mandate of separation of powers, and (2) violates the constitutional right to trial by jury. Appellants argue that the MTCA's limited waiver of immunity violates the separation of powers doctrine because it interferes with the right of judiciary to curb excessive jury verdicts and to render and enforce judgments. This argument is unavailing. The limited waiver of sovereign immunity did not limit the ability of Maryland judges to enter and enforce damage awards against the State. To the contrary, the limited legislative waiver of sovereign immunity established the ability of judges to enter damage awards where no ability previously existed.

The argument that the limited waiver violates the constitutional right to trial by jury is similarly unavailing. Prior to the enactment of the limited legislative waiver of sovereign

60

immunity, there was no right to recover tort damages against the State — by jury trial or otherwise. The partial waiver of sovereign immunity created a limited right to jury trial where none had previously existed. Accordingly, we hold that the MTCA, which permits a right to jury trial where no such right previously existed, does not violate appellants' constitutional right to jury trial.

**V.     The MTCA limits recovery against the State to no more than $200,000.**

We turn now to the issue raised by the State on its cross appeal. The State argues that the MTCA limits recovery against it to $200,000 and that the trial court erred in entering multiple judgments in the aggregate amount of $600,000. For the reasons to follow, we agree with the State on this point and hold that the appellants' judgments against the State are limited to $200,000 in the aggregate.

The MTCA provides, in pertinent part, that "[t]he liability of the State and its units may not exceed $200,000 to a single claimant for injuries arising from a single incident or occurrence." SG § 12-104(a)(2). The State relies on COMAR 25.02.02.02, an implementing regulation promulgated by the State Treasurer governing the administration of the MTCA. The State asserts that the following provisions of COMAR 25.02.02.02D are dispositive:

> D.     Limits of Liability.  Within total budgeted funds available for self-insurance coverage of tort claims, the limits of State liability shall be:
>
>> (1)     Subject to § D(2) of this regulation, $200,000 per claimant for all injury, loss, and damage to person and property arising from a single incident. **For the purpose of determining the limits of liability under this subsection, all persons claiming damages resulting**

**from:**

**(a)    Bodily injury to, or the death of, any one person shall be considered to be one claimant.**

(Emphasis added.)

Appellants argue that the language of the implementing regulation varies from the plain language of the statute, which specifies only a $200,000 limitation per claimant, without attempting to define or delimit "claimant."  Appellants contend that the State's regulation is at odds with the plain language of the statute, is entirely self-serving, and deserves no deference. Accepting these arguments, the trial court found that the implementing regulation was "contradictory to the legislative intent"; that legislative history did not support such a restrictive interpretation of § 12-104 as the State was attempting to ascribe to it with its regulation; and that the regulation relied on by the State "directly contravenes both the plain language of the MTCA and the demonstrated legislative intent." Consequently, the trial court concluded that there were three separate claimants — Mr. Parker, Sr.; Ms. Rodriguez; and the Estate of Mr. Parker, Jr. — and that each was entitled to collect $200,000 from the State under the MTCA, for a total recovery of $600,000.  We conclude that the trial court erred in this regard.[9]

---

[9]The trial court rejected another of the appellants' arguments, namely that there were also three separate incidents (misconduct on the day of the murder, misconduct the day prior and the State's negligence in failing to properly train and supervise its employees) that should entitle them to separate sets of limits on liability for each incident. Appellants failed to raise any challenge to this aspect of the trial court's decision in their opening brief.  The argument

(continued...)

No reported case from either appellate court of this State has ever squarely considered the question presented here, namely the weight to be given the implementing regulation at issue, COMAR 25.02.02.02(D).[10] For the following reasons, we hold that the regulation is entitled to substantial weight.

## A.    Statutory Interpretation

The Court of Appeals, in *Forster v. Public Defender,* 426 Md. 565 (2012), observed:

> The goal of statutory interpretation is to "ascertain and implement, to the extent possible, the legislative intent." An appellate court interprets a statute by first looking to its plain language, giving the words their natural and ordinary meaning.  To determine the plain meaning of language, we consider also the statutory scheme in which the particular provision or provisions appear.  If the language is clear and unambiguous on its face, our inquiry ends.

*Id.* at 579-80 (internal citations omitted).

Although the trial court's interpretation of SG §12-104(a)(2) is at issue in this appeal, there are other statutes and regulations relevant to our analysis. CJP § 3-904(f) establishes that

---

[9](...continued)
that appellants are entitled to a separate set of limits based on multiple alleged incidents is not preserved for review and will not be addressed.

[10]Although the alleged conflict between the statute and the regulation was briefed in *Goss v. Estate of Jennings*, 207 Md. App. 151, 175 (2012), we did not address the merits of the arguments in that case. We noted that the trial court had concluded that, "if the State were liable, a damage award would be limited to $200,000 despite the presence of multiple plaintiffs in the case," given that "there was [only] one victim and one accident." But, because we concluded in *Goss* that the State had no liability, we did not address whether the trial court had been correct in stating that there could not be more than one award of $200,000 in a case in which there was but one victim and one accident.

there can be but one action for wrongful death. That provision was at issue in *State v. Copes,* 175 Md. App. 351 (2007), where an action for wrongful death was initially brought by only one of a decedent's three adult daughters. This Court found that the proper notice given pursuant to the MTCA by one daughter sufficed to put the State on notice of the claims of the other daughters. *Id.* at 444-45. *Copes* also bears on the instant case because it discusses the effect of certain implementing regulations for the MTCA, including the notice provisions of COMAR 25.02.03.02.

In *Copes*, we noted that SG §12-106, which requires a "claimant" to provide notice to the State Treasurer of a claim within one year after the injury giving rise to the claim, does not otherwise define the term "claimant." Because SG §12-106 was "not clear on that point," we concluded that an ambiguity existed, which required us to resort to other "tools of statutory construction at our disposal," including COMAR. *Copes,* 175 Md. App. at 381(citing *Reier v. State Dep't. Of Assessments and Taxation,* 397 Md. 2, 26 (2007)). In *Copes*, we discussed the same section of COMAR at issue in the case at bar, the "State Insurance Programs" subtitle.

Our discussion in *Copes* noted:

> Administrative regulations have the force of law when they are "legislative" and not merely "interpretive." A regulation is "legislative" when it "affects individual rights and obligations" and "the agency intended the rule to be legislative as 'evidenced by such circumstantial evidence as the formality that attended the making of the law, including the rule making procedure and publication.'" Moreover, a "legislative" regulation is enacted under the authority of an express delegation of power from the legislature. . . .

64

An "interpretive" regulation, in contrast, "simply state[s] what the administrative agency thinks the statute means, and only 'remind[s]' affected parties of existing duties." While an interpretive regulation does not carry the force of law, it is entitled to deference because it reflects the agency's interpretation of its own statute.

*Id.* at 380 (internal citations omitted). We ultimately concluded in *Copes* that the regulations at issue should be treated as interpretative in nature, and "accord[ed] appropriate deference." Our conclusion is the same here.

As in *Copes,* the pertinent regulations in the instant case went through a notice and comment period, as documented in the *Maryland Register*. The specific language now found in 25.02.02.02(D)(1)(a) was first proposed in January 1990, and adopted effective April 16, 1990. 17:1 Md. R. 93; 17:7 Md. R. 853. Although there is no express delegation of rule-making authority to the Treasurer in the MTCA, the Treasurer is directed to "adopt necessary regulations: (1) to set policies and procedures for payment on losses, including adjustment and approval; . . . and (3) otherwise to carry out the duties of the Treasurer under this title." Maryland Code (2001, 2009 Repl. Vol.), State Finance and Procurement Article ("SFP"), § 9-104(b)(1), (3). Section 9-104(a)(1) establishes that the State Treasurer is responsible for the State Insurance Program, and § 9-104(a)(2) establishes that the Treasurer is the administrator of the State Insurance Trust Fund, which is the source of payments for losses under the MTCA.

In *Comptroller v. John C. Louis, Co.,* 285 Md. 527 (1979), the Court of Appeals recognized that administrative interpretations that have been "acquiesced in by the

65

Legislature" are entitled to "great weight," although such interpretations are not binding on the courts. *Id.* at 543. In that case, the Court of Appeals discussed factors that must be taken into account when determining the "proper weight to be accorded an administrative interpretation or practice[.]" *Id.* at 544. These factors include:

> the consistency of the administrative interpretation or practice with the purposes of the statute. Still another is the thoroughness, breadth, and validity of the considerations underlying the administrative interpretation or practice. The method by which the agency established its interpretation or practice reflects varying degrees of study and evaluation of the particularized problem. Thus, if an administrative interpretation has not resulted from a contested adversary proceeding . . . or from a *promulgated* administrative decision, rule, regulation or department statement, it is entitled to relatively little weight. Similarly, if the administrative practice has not been publicly established, it is not entitled to substantial weight.
>
> An additional significant factor is the consistency and length of the administrative interpretation or practice. Like an affirmative act, a failure to act can create inconsistency. When an agency fails to implement or enforce a statute in accordance with its own interpretation, it is acting inconsistently. Its failure to enforce diminishes the impact of the administrative interpretation. Accordingly, that interpretation is entitled to very little weight.

*Id.* at 544-45 (internal citations omitted) (emphasis in original).

We conclude that COMAR 25.02.02.02 is entitled to substantial weight. As noted, it is an administrative regulation, promulgated by the office in charge of handling MTCA claims (the State Treasurer), and, prior to its final adoption, the regulation was subject to a public notice and comment period. It has existed for over twenty years. As stated earlier, we have not been directed to, nor are we aware of, a published decision of either appellate court interpreting the claim limit provisions of the MTCA in the manner appellants urge. On the

66

contrary, Maryland cases have consistently held that, as the Court of Appeals recognized in *Proctor v. WMATA,* 412 Md. 691, 713 (2010), among the "notable features" of the MTCA is that "the State **retains its immunity for damages arising out of a single claim or occurrence in excess of $200,000.**" (Emphasis added.)

In reaching this conclusion, we necessarily reject the appellants' argument that the legislative history of the MTCA demands a different interpretation of the statute. Appellants point out that the limits on liability under the MTCA prior to 1985 "were $100,000 per individual claim and $500,000 per total claims arising from the same occurrence." Amendments to the MTCA later provided that sovereign immunity was waived to the extent of insurance coverage carried by the State. In 1999, the Maryland legislature again amended the statute to its current form. Citing this series of events, appellants argue that "it is evident that the Legislature did not intend the current statute to include an aggregate limit on the total value of all claims by all claimants arising from a single incident," and the General Assembly "specifically did away with the aggregate limit . . . evidencing the legislative intent that there be no such limit." The appellants urge us to conclude that "[t]he Legislature had just done away with a much higher $500,000 aggregate cap in a stated effort to *broaden* liability. Applying the much lower $200,000 cap in an aggregate fashion, as the State suggests would be a comparative *lessening* of liability – *the exact opposite of the legislative intent."* We disagree. In our view, the clear intent of the General Assembly in eliminating the "per occurrence language" was indeed to broaden the State's liability, but to do so by permitting

recovery by multiple individuals who sustained bodily injury in the same occurrence up to a limit of $200,000 per injured party. It was not the legislative intent, however, to allow an unlimited number of derivative claimants each to recover up to $200,000 for bodily injury to a single person in a single occurrence.

The COMAR provisions are consistent with the purposes of the MTCA. Although SG §12-102 requires the MTCA to be "construed broadly, to ensure that injured parties have a remedy," it is also the case that waivers of sovereign immunity are strictly construed in favor of the State. *Bd. of Educ. v. Zimmer-Rubert*, 409 Md. 200, 212 (2009).

The COMAR provisions are also consistent with holdings by our appellate courts in other cases. In *Board of County Commissioners of St. Mary's County v. Marcas, LLC,* 415 Md. 676, 687 (2010), a case interpreting the LGTCA, the Court concluded "that the General Assembly intended that courts would use the insurance industry's definitions of 'individual claim' and 'same occurrence' when applying C.J. §5-303," the LGTCA corollary to the MTCA liability limits set forth in SG §12-104.[11] *See also West American Ins. Co. v. Popa,* 352 Md. 455, 470 (1998) ("[T]he monetary limit under the Maryland Tort Claims Act is very much like a private defendant's liability insurance limits.").

Cases interpreting "per claim" and "per occurrence" language in insurance polices have consistently held that the "per claim" limit sets the upper ceiling on recovery for an injury

---

[11]Maryland Code (1973, 2006 Repl. Vol.), C.J. §5-303(a)(1) provides, in pertinent part: "[T]he liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence. . . ."

involving one person, whether it be for direct or derivative claims. One bodily injury gives rise to a claim for personal injury (if the injured party survives), or wrongful death (if he does not), and can spawn claims derivative of that single bodily injury; but one bodily injury equals one "claim." More than one bodily injury triggers the "per occurrence" language. "Under policies fixing a maximum recovery for 'bodily injury' to one person, the vast majority of courts have held that such a 'per person' liability limitation applies to all claims of damage flowing from such bodily injury. Therefore, such consequential or derivative damages are computed together with the claim for bodily injury of which they are a consequence." *Daley v. USAA,* 312 Md. 550, 553-54 (1988) (internal citations omitted).

A similar interpretation of the per claim limit has been applied in cases arising under the LGTCA. *See, e.g., Surratt v. Prince George's County*, 320 Md. 439, 454 (1990); *Espina v. Prince George's County*, 215 Md. App. 611, 647 (2013), *cert. granted sub nom.*, *Espina v. Jackson*, 438 Md. 142 (2014); *Leake v. Johnson*, 204 Md. App. 387, 416 (2012).

Although appellants argue that our consideration of cases interpreting insurance contracts — such as *Daley v. USAA, supra* — is a "wasted exercise," we have made reference in prior decisions to the "Court of Appeals' repeated statements that, in construing limitations on local government tort liability, courts should look to definitions in the insurance industry." *Leake, supra,* 204 Md. App. at 413. We are persuaded that interpretation of the claim limits in the MTCA deserve similar review.

For the foregoing reasons, we conclude that appellants are entitled to collect a total of no more than $200,000 from the State of Maryland pursuant to the MTCA.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE-HALF BY APPELLANTS AND ONE-HALF BY THE STATE.**

G:\COSA UNREPT\Term 2012\0748s12.wpd